UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

STEPHEN H. PERRON,
And
CHRISTINE M. JACKSON                          Case No.:1:12-cv-1853

      Plaintiffs,

   v.                                          Jury Trial Requested

JPMORGAN CHASE BANK, N.A.,
Formally known as,
CHASE HOME FINANCE, LLC,

      Defendant.

## COMPLAINT AND DEMAND FOR JURY TRIAL

1.     This complaint is filed for violations of the Real Estate Settlement and Procedures Act (RESPA), 12 U.S.C. § 2601 et.al.; Breach of Contract; Breach of Duty of Good Faith and Fair Dealing; Negligent Training, Supervision and Retention by JPMorgan Chase Bank, N.A., formally known as, Chase Home Finance, LLC ("Chase").

## II. JURISDICTION AND VENUE

2.     This court has jurisdiction under the RESPA pursuant to 12 U.S.C. § 2614 and 28 U.S.C. §§ 1331, 1337.

3.     This court may exercise supplemental jurisdiction over the related state law claims under 28 U.S.C. § 1367.

4.     The events which give rise to Plaintiffs' claims occurred in Hamilton County, Indiana.  Therefore, venue is proper in the Southern District of Indiana.

## III.  PARTIES

5.      Plaintiffs Stephen H. Perron and Christine M. Jackson ("Homeowners") are consumers who reside in Hamilton County, Indiana.  Mr. Perron is a retired criminal investigator for the Internal Revenue Service.  Ms. Jackson is an attorney who represents consumers with financial disputes against their lenders, including homeowners in foreclosure.

6.      Defendant JPMorgan Chase Bank, N.A. ("JPMC") is chartered as a national bank, regulated by the Office of the Comptroller of Currency (OCC) and headquartered at 1111 Polaris Parkway, Columbus, Ohio  43240.  JPMC acquired Chase Home Finance, LLC on May 1, 2011.  Chase Home Finance, LLC ("Chase") is a Delaware Limited Liability Company that withdrew its Indiana business license on May 16, 2011.  Chase is an agent for FANNIE MAE (the alleged holder of the note at issue) hired to collect mortgage payments, to interact with borrowers to account for payments made and expenses charged per the terms of the note and mortgage.  Chase's duties as loan servicer are governed by regulations which can be viewed on FANNIE MAE's website, https://www.efanniemae.com/home/index.jsp.

## IV.  FACTUAL ALLEGATIONS

7.      The Homeowners have a first mortgage on their personal residence which was serviced by Chase Home Financing LLC ("Chase") during 2008 through present.

8.      Based on information and belief, Chase Home Financing LLC was acquired by JPMC in May of 2011 and JPMC now services the Homeowners' loan.

9.      Homeowners did not receive any notice from Chase or JPMC informing them of a change in loan servicers.

10.     In 2008, Homeowners' scheduled monthly mortgage payment, including principal, interest and escrow, was $1,469.20 and in 2009, was $1,463.23.  Homeowners paid their monthly mortgage payment by automatic electronic bank transfer.

11.     Sometime in February 2009, Chase deducted $1,422.00 from the Homeowners' escrow account, and labeled the deduction as "Homeowner's Insurance."

12.     Then in March 2009, Chase deducted $838.00 from the Homeowners' escrow account for the Homeowners' actual homeowners' insurance premium.

13.     In December 2009, Chase's automated annual escrow analysis software program calculated the Homeowners' projected 2010 insurance obligation based on the incorrect amount of $2,260.00 – the sum of both amounts labeled as Homeowners' Insurance from the Homeowners' 2009 escrow account.

14.     The Homeowners' actual 2009 homeowners' insurance premium was only $838.00.

15.     Due to the incorrect projection for Homeowners' 2010 insurance premium, Chase computed a phantom escrow "shortage" of $802.28 as of December 31, 2009.

16.     Consequently, Chase's escrow software program added an additional $66.00 to each of the Homeowners' 2010 scheduled monthly mortgage payments to recoup the phantom 2009 escrow "shortage".

17.     Chase calculated the Homeowners' 2010 scheduled monthly mortgage payment to be $1,499.01.

18.     The Homeowners made, and Chase accepted, by automatic electronic bank transfers, in the amount of $1,469.20 from January 2009 through November 2011.

19.     On or about November 23, 2011, Homeowners logged onto the Chase online account website to change the bank account from which Chase should deduct their monthly mortgage payments.  At this time, Homeowners first discovered that Chase miscalculated the amount of their 2010 scheduled mortgage payments due to the improper inclusion of the February 2009 $1,422.00 "Homeowners' insurance" charge in Chase's 2010 escrow calculation.

20.     The online account information also showed that despite the failure of the Homeowners to increase their 2010 monthly payments (to include the incorrectly computed escrow "shortage" amount), the Homeowners' 2010 escrow account ended the year with $250.05 of excess funds that would be refunded to Homeowners in January 2011.

21.     Also, the online account information showed that Chase calculated the Homeowners' 2011 scheduled monthly mortgage payment to be $1,399.23.

22.     After many hours of research to uncover the above error, Homeowners contacted a Chase representative by phone to alert Chase to the error and to determine the correct amount that Homeowners' should pay for their December 2010 monthly payment.

23.     Homeowners explained the error to the Chase representative who acknowledged that she saw how the error occurred.  Homeowners asked Chase what to do about their December 2010 payment because the online website would only allow Homeowners to set up an auto pay in the amount of $1,499.01, however, their 2010 escrow account already had a $250.00 surplus and their 2011 monthly payment was calculated to be only $1,399.23.

24. Chase told Homeowners that it would code their Account to accept a payment in the amount of $1,399.23 for December 2010 and instructed Homeowners to make their December payment at a bank branch. Chase also stated that the new automatic monthly electronic bank transfer from the new bank account would be effective January 2011, in the amount of $1,399.23.

25. Homeowners made a payment in the amount of $1,399.23 at a local Chase bank branch on December 3, 2010.

26. On or about December 28, 2010, Homeowners received a check from Chase in the amount of $250.05 representing the amount their 2010 escrow account overage.

27. On or about January 10, 2011, Homeowners received eight (8) form letters from Chase bank: Presuit Notice dated 01/04/2011 to Stephen H. Perron via certified mail; Presuit Notice dated 01/04/2011 to Christine M. Jackson via certified mail; Presuit Notice dated 01/04/2011 to Stephen H. Perron via first class mail; Presuit Notice dated 01/04/2011 to Christine M. Jackson via first class mail; Notice of Intent to Foreclose dated 01/04/2011 to Stephen H. Perron via first class mail; Notice of Intent to Foreclose dated 01/04/2011 to Christine M. Jackson via first class mail; ACH Program Termination dated 01/04/2011 to Perron and Jackson via first class mail; Letter, dated 01/05/02011, stating the Account was in Default and sent to Perron and Jackson via first class mail; Letter, dated 01/10/ 2011, stating the Account was now 2 payments behind for December 2010 and January 2011 sent to Perron and Jackson via first class mail.

28.     Upon reviewing the letters and their online account information, Homeowners discovered that Chase did not apply the Homeowners' December 2010 payment towards their December monthly payment obligation.

29.     Instead, Chase put Homeowners' December 2010 payment, in the amount of $1,399.23, into a "suspense" account.  Chase then coded the Homeowners' Account as being in default.

30.     Based on information and belief, once Chase's payment collection software system codes an account as "in default," the program is designed to terminate any ongoing automatic payments set up by the Homeowner.

31.     Consequently, even though Chase had authority to process the Homeowners' January electronic payment order, Chase's system did not process their January 2011 mortgage payment because it incorrectly coded the Homeowners' Account to be "in default."

32.     Homeowners first learned that Chase did not process their January 2011 mortgage payment until after receipt of the above letters.

33.     Homeowners became extremely upset and anxious because they knew through Jackson's law practice that loan servicers do not have adequate procedures in place to review and correct errors that loan servicers make to customer accounts.

34.     On or about January 10, 2011, Homeowners sent Chase a Qualified Written Request (QWR) pursuant to the Real Estate Settlement Procedures Act (RESPA) informing Chase of the error and requested that Chase reverse the error and correct Homeowners' Account.

35.     Chase received the Homeowners' QWR on January 12, 2011.

36.     Chase acknowledged receipt of Homeowner's "correspondence" by a letter dated January 27, 2011.

37.     On or about January 28, 2011, Homeowners received the first call from Chase's collection department.  Perron answered the phone, heard that the call was from Chase and then hung up the phone.

38.     From February 2011 through the time the Homeowners' phone number was disconnected, Chase's automated collection "robo-call" program dialed the Homeowners' phone at least two (2) times per day every day of the week.  Most of the time, Homeowners did not answer the phone.

39.     On or about February 8, 2011, Jackson took a collection call from Diana Giron, an employee from Chase's Costa Rica call center.

40.     Giron stated that Homeowners had $1,277.37 in their "suspense" account and that Homeowners were behind three (3) payments (December 2010, January 2011, February 2011).

41.      Jackson spent about 15 minutes trying to explain Chase's escrow error to Ms. Giron.  However, Ms. Giron continued to read from her collection "script," ignoring Jackson's explanation.

42.     Ms. Giron informed Jackson that she would have a bad credit report and face foreclosure if she did not pay Chase all the money it stated was owed.

43.      In an attempt to make the collection robo-calls stop, on or about February 24, 2011, Jackson took another collection call from Carissa, an employee from Chase's Home Department.  Jackson spent approximately 25 minutes on the phone.

44.     Jackson explained the error made by Chase and informed Carissa that a QWR had been mailed to Chase requesting the error to be corrected.

45.     Jackson also requested that Chase code their Account to eliminate the daily robo-calls.  Carissa stated that she would continue to call Homeowners weekly until the problem was resolved.

46.     Carissa attempted to convince Jackson to make at least one (1) mortgage payment to keep the Account from foreclosure.  Carissa stated that if the Account was only one (1) month behind a foreclosure would not be initiated.

47.     Jackson explained that if she made any payment to Chase before the Account error was corrected, Chase's accounting software program would continue to charge the Account for default fees and the Account would continue to remain in default. Jackson stated that Chase was not entitled to late and default fees due to its error to the Homeowners/ Account.

48.     Jackson told Carissa that if Chase did not correct the account as a result of the Homeowners QWR, the only way to permanently fix the problem would be through a lawsuit.

49.     Carissa told Jackson to call Chase's Customer Service Department at least once per week to be sure that they were working on the error.  Jackson informed Carissa that  she would not do so as it was a waste of time because the phone representatives at Chase's Customer Service Department  only read from a pre-determined script and had no authority to correct errors

50.     On or about February 28, 2011, Chase sent Homeowners a purported response to their QWR.  The response was a form letter from Chase Home Lending and stated that a loan history and escrow statements were enclosed.

51.     Chase's response did not reference the Homeowners specific error and request for correction.

52.     Based on Jackson's information and belief, Chase has a pattern and practice of failing to properly review QWRs from borrowers and routinely replies to borrowers specific requests with a standardized form letter that does not address the borrowers specific concerns.

53.     On or about April 27, 2011, Homeowners sent a second QWR to Chase, again asking Chase to correct their error and to pay damages for Chase's unlawful actions.

54.     Chase received the second QWR on May 2, 2011.

55.     Chase never responded to Homeowners second QWR.

56.     On or about October 25, 2011, Homeowners spent two (2) hours on the phone with representatives for Chase attempting to determine 1) the correct address to mail a new QWR and 2) why they could not access their account information online.

57.     During this conversation, the Homeowners were repeatedly transferred between the Chase Customer Care department and the Chase Loss Mitigation department.

58.     In summary, no Chase representative was able to tell the Homeowners the correct address to be used to mail a QWR.

59.     Furthermore, the Chase Loss Mitigation representative harassed the Homeowners continuing to tell them that 1) it did not matter whether Chase had made an

error, 2) that Chase had a õvalidö foreclosure against Homeowners and 3) that it did not

matter what a judge determined the Homeowners owed on the Account because the

Homeowners would have to pay Chase everything it wanted if they wanted to keep their

home.

60.     Jackson spoke with the media in January 2012 in order to get Chaseøs

attention and an article about the situation was published by the Huffington Post.

61.     Shortly thereafter, the Homeowners received a letter from Chaseøs

Executive Office stating it had received our correspondence and that a representative

would be contacting them within 10 days.

62.     Based on information and belief, Chaseøs letter was sent as a result of  the

news article.

63.     Jackson received an email from a local attorney representing Chase.

64.     Attempts to resolve this matter prior to litigation have been unsuccessful.

65.     Homeowners experienced significant stress and frustration beginning

when Chase did not properly reply to their first QWR because Homeowners knew due to

Jacksonøs consumer law practice that if Chase did not correct the error as a result of their

QWR, it would take many years to force Chase to correct its error.  In the meantime, the

Homeownersøcredit scores would be ruined, as would their ability to obtain credit, car

insurance and property insurance at reasonable rates.

66.     The financial and emotional stress caused by this situation adversely

affected the Homeownersømarriage and Perron filed for divorce in March of 2012.

67.     Based on information and belief, Jacksonøs employment applications with

the Consumer Financial Protection Bureau and the Federal Reserve Board were adversely

affected by Chase's negative credit reporting.  Furthermore, Chase's failure to correct the error as requested in the QWR, affected Jackson's ability to practice law as her credit lines were reduced, she was denied access to new credit, she experienced anxiety, excessive stress and her Crohn's disease flared, requiring hospitalization and a 4 month leave of absence from work.

## V.   CAUSES OF ACTION

**Count I – Violations of Real Estate Settlement Procedures Act (RESPA)**

68.    The allegations of the aforementioned paragraphs are re-alleged and incorporated by reference.

69.    Chase is a loan "servicer" of Homeowners' "federally related mortgage loan" as those terms are defined in the Real Estate Settlement and Procedures Act. ("RESPA"), 12 U.S.C. § 2601(1) and 12 U.S.C. § 2605(i)(2).

70.    CHASE violated RESPA, 12 U.S.C. § 2605(e)(2)(c), by failing to provide Homeowners' with the information and documentation requested, or an explanation why the information sought was unavailable, no later than sixty (60) days after receipt of Homeowners' Qualified Written Request.

71.    CHASE violated RESPA, 12 U.S.C. § 2605(e)(2), by refusing to cease its collection efforts and foreclosure proceedings after receiving Homeowners' Qualified Written Request.

72.     Upon information and belief, CHASE violated RESPA, 12 U.S.C. § 2605(e)(3), by providing information to consumer reporting agencies regarding overdue payments allegedly owed by Homeowners that were related to their Qualified Written Request.

73.     Based on information and belief, CHASE has engaged in the pattern and/or practice of non-compliance with the requirements of the mortgage servicer provisions of RESPA as set forth in 12 U.S.C. § 2605.

74.     Homeowners suffered actual damages, including but not limited to, mental anguish, medical costs, postage costs, transportation costs, photocopying costs, credit damage, loss of access to credit, loss of work production, loss of potential employment and loss of marital relationship as a result of CHASE's violation of RESPA.

WHEREFORE, Homeowners request a trial by jury and that this Court declare that CHASE has violated RESPA, enjoin CHASE from committing any future violations of the Act, and award Homeowners actual and compensatory damages, including those for mental anguish, in an amount to be determined at trial, statutory damages, attorney's fees and costs pursuant to 12 U.S.C. § 2605(f) and grant Homeowners all just and proper relief.

## Count II – Breach of Contract

75.     The allegations of the aforementioned paragraphs are re-alleged and incorporated by reference.

76.     CHASE as agent for Fannie Mae,  breached the following contractual obligations to Homeowners (including but not limited to):

    a.  Failing to apply all payments received from Homeowners to the principal and interest accrued on Homeowners' loan account according to the terms of the Note;

    b.  Assessing the Homeowners' loan account charges and fees not agreed to between the parties or unreasonable fees;

c.  Improperly allocating payments received from the Homeowners to fees and charges not agreed to between the parties.

WHEREFORE, Homeowners request a trial by jury and that this Court, order CHASE, as agent for Fannie Mae  to correct and re-credit Homeowners loan account for payments which were improperly applied,  reverse the improper default  fees charged to Homeowners account, recompute any additional interest accumulated due to CHASE erroneous accounting, enjoin CHASE from collecting or attempting to collect any deferred interest, attorney's fees or other charges in breach of the Note and grant Homeowners damages and all other relief as allowed by law.


**Count III – Breach of Duty of Good Faith & Fair Dealing**

77.  The allegations of the aforementioned paragraphs are re-alleged and incorporated by reference.

78.  CHASE, as loan servicer, had a fiduciary duty to Homeowners to properly handle the Homeowners escrow account.

79.  Due to CHASE mishandling of the Homeowners escrow account, Chase breached its duty of good faith and fair dealing and Homeowners suffered damages as stated above.

WHEREFORE, Homeowners request a trial by jury and that this Court declare CHASE breached is duty to good faith and faith dealing to Homeowners and award a judgment in an amount that will fully and adequately compensate Homeowners for their losses, including punitive damages, and grant Homeowners all other just and proper relief.

**Count  IV – Negligent Supervision, Retention and Training**

80.    CHASE, as loan servicer, has a duty to comply with federal laws and regulations including the Real Estate Settlement Procedures Act.

81.    CHASE,  as loan servicer under RESPA, has a duty to properly and accurately calculate proper monthly escrow payments, escrow shortages and escrow deficiencies pursuant to 12 U.S.C. § 2609 and Reg. X, 12 C.F.R. § 1024.17.  There is no private right of action under this RESPA section.

82.    CHASE, also has a duty to properly review and respond to QWRs received from borrowers and correct any errors made to borrowers' accounts.

83.    Under Indiana law, a failure to meet these legal duties is negligence per se.

84.    CHASE failed to reasonably train and retain employees to properly analyze and calculate monthly escrow amounts as required by RESPA.

85.    CHASE also failed to reasonably train and retain employees to properly respond to borrowers' QWR requesting correction of an account error by CHASE.

86.    As a direct and proximate result of CHASE's negligent training and retention of employees, Homeowners sustained injuries of a personal and pecuniary nature.

87.    As a direct and proximate result of CHASE's  negligence, Jackson was required to seek medical treatment from various health care providers and has incurred medical expenses and may continue to incur future medical expenses.

88.    As a direct and proximate result of CHASE's negligence, Jackson has incurred a loss of income and may incur additional lost income in the future.

89.     As a direct and proximate result of CHASE's negligence, Jackson experienced physical manifestations of stress and mental anguish, including cold sweats, headaches, stomach cramps, diarrhea, mouth sores, Crohns inflammation and joint inflammation all of which may continue for an indefinite period.

WHEREFORE, Homeowners request a trial by jury and that this Court declare CHASE was negligent in training and retaining employees to meet its lawful duties to Homeowners and award a judgment in an amount that will fully and adequately compensate Homeowners for their losses, including punitive damages, and grant Homeowners all other just and proper relief.

## JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully submitted,

**The Frasher Law Firm, P.C.**

By:s/ Ryan Frasher
Ryan Frasher, Esq.
**THE FRASHER LAW FIRM, P.C.**
155 E. Market Street, Ste. 450
Indianapolis, IN 46204
(317) 634-5544 – telephone
(317) 630-4824 – facsimile
email: rfrasher@frasherlaw.com