IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| STEPHEN H. PERRON and the UNITED STATES BANKRUPTCY TRUSTEE OF THE SOUTHERN DISTRICT OF INDIANA, | ) ) ) ) ) |
| *Plaintiffs*, | ) ) |
| *vs.* | ) CASE NO. 1:12-cv-1853-TWP-TAB ) |
| JPMORGAN CHASE BANK, N.A., f/k/a CHASE HOME FINANCE, LLC | ) ) ) |
| *Defendant*. | ) |

---

JPMORGAN CHASE BANK, N.A.'S BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT

---

JPMorgan Chase Bank, N.A., f/k/a Chase Home Finance, LLC, respectfully submits the following Brief in Support of its Motion for Summary Judgment.

## I.    PRELIMINARY STATEMENT

Chase has serviced Steven Perron and Christine Jackson's ("Borrowers") residential mortgage since 2005. As part of its contractual and legal servicing responsibilities, Chase must ensure that Borrowers earmark enough money to go into their escrow account in order for Chase to forward payment for Borrowers' annual Allstate homeowners' insurance premium and biannual tax bill. In 2010, Borrowers came to the false belief that Chase was earmarking more than what was necessary, and claimed that Chase made an "unauthorized" escrow disbursement of $1,422.00 in 2009, which created a calculation error that produced a "phantom escrow" shortage on

Borrowers' account.  So Borrowers sent Chase a January 10, 2011 letter titled a "Qualified Written Request" demanding Chase refund and return the alleged "unauthorized" escrow disbursement of $1,422.00 and to immediately lower Borrowers' monthly mortgage payments.

Chase's responded on February 25, 2011 with a letter attaching Borrowers Detailed Transaction History, which included Borrowers' loan history and escrow payment history since 2005. The attached Detailed Transaction History showed that the $1,422.00 "unauthorized" disbursement was anything but unauthorized—it in fact showed that the $1,422.00 payment was made on February 17, 2009 to renew Borrowers' annual scheduled "HOMEOWNERS INSURANCE" policy, which Chase had renewed every mid-February since 2005. Moreover, a couple weeks after Borrowers' insurer Allstate received the $1,422.00 in premium, Allstate refunded the entire $1,422.00 to Borrowers and sent them a check dated March 2, 2009 as the result of Borrowers' decision to switch insurance companies.

Considering that the Detailed Transaction History labeled the $1,422.00 payment as one to "HOMEOWNERS INSURANCE," along with the fact that the disbursement was made in mid-February like every other insurance payment made from 2005 to 2009, what the payment was for and who it was made to should have been clear to the Borrowers even if they had not received the $1,422.00 from Allstate. Yet, in a follow-up letter sent to Chase on April 27, 2011, Borrowers stuck with their script and continued to feign confusion over the whereabouts of the $1,422.oo. Borrowers once again demanded that Chase disclose "the name, address and phone number of the entity that received the $1,422.00 from our escrow account in February 2009." Borrowers also issued a demand that Chase pay Borrowers $330,000.00 in damages allegedly incurred because of

2

Chase's alleged failure to adequately respond to Borrowers January 10, 2011 letter. After Chase did not respond to their demand, Borrowers filed suit, alleging that Chase violated RESPA by not responding to their letter adequately.

Chase provided Borrowers with a sufficient response in compliance with RESPA and handled escrow payments as required by law. It is more than a stretch for Borrowers to now attempt to pin blame on Chase under RESPA for not giving them enough information to determine the whereabouts of a $1,422.00 disbursement that was refunded to Borrowers themselves a few weeks later. Just because Borrowers claim to have not realized what should have been obvious does not mean that Chase violated RESPA. RESPA was not enacted to create a continued obligation to explain the obvious. Chase gave Borrowers enough information and did not miscalculate or miss an escrow payment. The only missed payments existing in this case are the monthly mortgage payments Borrowers have not paid since January of 2011. Summary judgment should thus be entered in favor of Chase.

## II.    STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### A. *The Mortgage and Escrow*

In 2003, Stephen Perron and Christine Jackson ("Borrowers"), then married, purchased a home at 1235 E. 106th St. Indianapolis, Indiana 46280 by obtaining a mortgage loan, which the Federal National Mortgage Association currently holds ("Mortgage"). (*See* Ex. 2: First Amended Complaint, Dkt. 41, ¶6; Ex. 6: Chase's Answers to First Amended Complaint, Dkt. 42, ¶ 6) Chase subsequently became the servicer of the Mortgage.  (*See* Ex. 2, Dkt. 41, ¶¶6-8; Ex. 6, Dkt. 42, ¶6-8)

The Mortgage provides in part:

***Uniform Covenants***, ¶ 3: Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

*****************************************************************************

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments.

(*See* Ex. 14: Borrowers' Mortgage, ¶ 3 pg. 4).

### B.  Chase begins servicing the Mortgage

In 2005, Chase began servicing the mortgage, which included paying Borrowers' homeowners' insurance out of their escrow account as the Mortgage required.  (*See* Ex. 2, Dkt. 41, ¶6; Ex. 6, Dkt. 42, ¶ 6) To pay Borrowers' insurance, each February from 2005 to 2009 Chase would forward payments from the escrow to Borrowers' homeowner insurer Allstate in the following amounts:

***February 16, 2005***: $971.00 (*See* Ex. 9: Chase's QWR Response, pg. 15)
***February 16, 2006***: $1,029.00 (*Id.*, pg. 13)
***February 16, 2007:*** $915.00 (*Id.*, pg. 11)
***February 19, 2008***: $924.00 (*Id.*, pg. 9)
***February 17, 2009:*** $1,422.00 (*Id.*, pg. 7)

A few weeks after Chase forwarded Allstate Borrowers' premium payment, Chase discovered that Borrowers had terminated their Allstate policy effective March 5, 2009,

4

in exchange for a new homeowners' policy with Homesite Insurance. (*See* Ex. 3: Chase's

March 5, 2009 letter) Chase paid Borrowers' new insurer Homesite the on March 4,

2009. (*See* Ex. 9, pg. 6) Chase then sent Borrowers a letter stating:

> Dear Stephen H Perron and Christine Jackson:
>
> Chase recently received replacement coverage from Homesite Insurance Company on your property effective Thursday, March 05, 2009.  Chase is unable to cancel your previous coverage.  Please contact your agent to cancel this policy.
>
> Because two homeowner's insurance premiums may have been paid, Chase will deposit any refund received from your canceled policy into your escrow account.
>
> If you receive the refund, please send it to Chase immediately so we can deposit it into your escrow account to minimize the potential for an escrow shortage.  If Chase has not received a refund in our office by the time of your next escrow analysis, your payment amount will increase accordingly.  Please mail the refund to:
>
> Chase Home Finance
> Insurance Processing Center
> Post Office Box 47020
> Doraville, GA  30362

(*See* Ex. 3) Unbeknownst to Chase at the time of the letter, Allstate had already sent

Borrowers a refund check dated March 2, 2009, for the entire $1,422.00. (*See* Ex. 1;

Perron Dep: 65:3-16, 66:3-5; Ex. 4: Allstate check for$1,422.00) Despite Chase's request

in the March 5, 2009 letter, Borrowers did not send Chase the refund check to replenish

the escrow and di not inform Chase of receiving the $1,422.00. (*See* Perron Dep: 66:3-

25, 67:1-22) On April 28, 2009, Borrowers deposited the $1,422.00 Allstate refund into

their National City Bank account. (*See* Ex. 4; Perron Dep: 65:9-25, Ex. 6)

### C. *The 2009 and 2010 Annual Escrow Account Statements*

Eight months from the day Borrowers cashed the $1,422.00 Allstate refund,

Chase sent Borrowers their Annual Escrow Disclosure Statement dated December 28,

2009. (*See* Ex. 11) The Escrow Disclosure Statement explained the current status of

Borrowers' loan as a principal balance of $185,936.55 and an escrow balance of

$439.96. (*Id.*) The Escrow Disclosure Statement further informed Borrowers that—

under federal law—their escrow balance could not dip below $496.42. (*See* Ex. 11) Borrowers were told that with a $439.96 escrow balance, they were facing a shortage because their balance was less than the minimum federal law required, which for Borrowers was $496.42. (*Id.*)  To resolve the shortage, Chase explained to Borrowers that, within the next 12 months, Borrowers would need to make up the difference between their "Anticipated Escrow Balance" and their "Target Escrow Balance." (*Id.*) The difference between Borrowers "Anticipated Escrow Balance" and their "Target Escrow Balance" constituted their "Escrow Shortage," which Chase calculated to be a shortage of $802.28. (*See* Ex. 11)

### 1. *Calculating the Escrow Shortage = Difference of Anticipated Escrow Balance and Target Escrow Balance*

*Anticipated Escrow Balance Calculation = $684.62*: Because Borrowers' term began on February 1, 2010, the $684.62 Anticipated Escrow Balance was calculated by adding the escrow balance current as of the December 28, 2009 Escrow Disclosure Statement of $439.96, to the final scheduled escrow payment Borrowers were to make in January of $244.66. (*See* Ex. 11) Adding $439.96 and $244.66 equals $684.62, the Anticipated Escrow Balance to begin the term. (*Id.*)

*Target Escrow Balance Calculation = $1,486.90*: Chase explained to Borrowers that the target escrow balance was the "beginning balance necessary to bring your escrow account at its lowest point during the next 12 months to zero plus the required reserve." (*Id.*) The required RESPA reserve was $427.16. (*Id.*) During the next 12 months, Chase was required to pay Borrowers' homeowners' insurance and taxes, which Chase projected as: (i) an $838.00 March payment for Borrowers' Homesite homeowners' insurance; (ii) a $862.48 April payment for county taxes; and (iii) a

$862.48 October payment for county taxes, which totaled $2,562.95. (*See* Ex. 11) With a projected total of $2,562.95 to go out of Borrowers' escrow in the next 12 months, Chase explained to Borrowers that their $213.58 ($213.58 x 12 = $2,562.95) monthly payment would not be enough to keep the escrow account afloat and from experiencing a funding deficit of $375.12 by April of 2010.[1] (*See* Ex. 11)

To bring their escrow to its lowest projected balance point for the next 12 months, Borrowers would have to fund the escrow with both the $375.12 projected deficit and the $427.16 required reserve, which added together, equaled $802.28, which was the Escrow Shortage amount. (*See* Ex. 11) The Target Escrow Balance would simply be the $802.28 of Escrow Shortage added with the "Anticipated Escrow Balance" of $684.62, which = $1,486.90, the Target Escrow Balance. (*Id.*)

To compile the $802.28 in funds needed to reach a $1,486.90 Target Escrow Balance, Chase informed the buyers that they could:

- Submit a one-time, lump-sum, payment of $802.28, in which case, Borrowers' total monthly payment would be reduced to **$**1,432.15 ($1,218.57 in principal and interest + $213.58 to escrow); or

- Pay the $802.28 shortage over a spread of 12 months, in which case, Borrowers' monthly payment would increase monthly by $66.85 to **$1,499.01** (1,218.57 in principal and interest + $213.58 to escrow + $66.85 to the spread).

(*See* Ex. 11)

---

[1] To calculate the April funding deficit of $375.12:

- From February to April 2010, three $213.58  monthly escrow payments were to be made, which = $640.74 + $684.62 escrow balance carried over from the prior term= a $1,325.30 April 2010 balance;

- But by April of 2010, Borrowers' escrow had to cover the projected $838.00 in homeowners' insurance and the $862.48 in projected April taxes, which = $1,700.48;

- Taking the projected $1,700.48 coming out from the $1,325.30 coming in = a negative $375.12 escrow balance by April.

Despite Chase's explanation and request for funds, Borrowers never submitted a lump-sum payment of $802.28; nor did they pay the $1,499.01 monthly to cover the spread. (*See* Ex. 9) Although the escrow balance dwindled down to as low as $74.25 in February and $77.96 in April of 2010, Borrowers' escrow account did not go into a deficit because the county taxes turned out to be less than projected (actual taxes in 2010 were $1,306.94 vs. the $1,724.96 projection).  (*See* Exs. 11 & 12) And by the end of the term, the lower taxes resulted in the Borrowers receiving a $250.00 refund check from Chase in January of 2011. (*See* Ex. 1; Perron Dep: 79:22-25; 80:1-10)

### D. *Borrowers' Final Payment and Qualified Written Request*

In November of 2011, Borrowers came to believe that Chase had miscalculated the amount of their 2010 scheduled mortgage payments due to the inclusion of the February 2009 $1,422.00 "Homeowners' Insurance" charge. (*See* Ex. 2: First Amended Complaint, Dkt. 41, ¶19) On December 3, 2010, Borrowers made what has turned out to be their last payment on the Mortgage in the amount of $1,399.23, which Chase placed in a suspense account. (*See* First Amended Complaint, Dkt. 41, ¶ 29; Ex. 9) Then with correspondence received on January 10, 2011, Chase notified Borrowers that they were in default. (*See* First Amended Complaint, Dkt. 41, ¶ 27) That same day Borrowers sent Chase a letter entitled the Qualified Written Request letter ("QWR Letter"). (*See* Ex. 5: Borrowers' QWR Letter) In the QWR Letter, Borrowers accused Chase of "improperly" taking $1,422.oo from their escrow account in February of 2009 and demanded Chase return "the $1,422.00 improperly taken from our escrow account, re-credit our account for all improper default fees and report our account as current to the credit bureaus." (*Id.*) Borrowers stated that, at the time, they did not realize that the $1,422.oo was a forwarding payment for Borrowers' Allstate premium and had forgotten about

depositing the $1,422.00 refund into their National City bank account.  (*See* Perron Dep: 63:22-25, 64:1-24, 75: 21-25, 76:1-16)

On January 27, 2011, Chase sent Borrowers a letter in response to the QWR informing Borrowers that Chase had received their QWR and were investigating the issue. (*See* Ex. 13) On February 28, 2011, Chase sent Borrowers a letter in response to their QWR, which included Borrowers' loan history and escrow statements containing a line-item explanation that the $1.422.00 was sent on February 17, 2009 for homeowners' insurance. (*See* Ex. 9) Borrowers then sent another letter to Chase on April 27, 2011, requesting the same information. (*See* Ex. 10) Chase did not respond to the April letter.

### E.  Borrowers' Lawsuit

On December 19, 2012 the Borrowers filed a Complaint against Chase alleging violations of RESPA, Breach of Contract, Breach of Duty of Good Faith and Fair Dealing, Negligent Training, Supervision and Retention by Chase. (*See* Complaint, Dkt. 1) In their Complaint, Borrowers alleged that they suffered financial and emotional distress as a result of the failed attempts to resolve the alleged error on their Mortgage account. (*See* Complaint, Dkt. 1, ¶¶ 65-67) They also alleged that the stress adversely affected their marriage and Mr. Perron filed for divorce in March of 2012. (*See* Complaint, Dkt. 1,¶ 66) On March 15, 2013, Chase filed its Partial Motion to Dismiss and Brief in Support. (Dkt. 13-14) Borrowers filed a Response in Opposition on April 26, 2013. (Dkt. 19) Then on March 10, 2014, the Court dismissed Borrowers' Breach of Contract and Negligent Training, Supervision and Retention claims. (Dkt. 35)

### F.  Christine Jackson's Bankruptcy

On January 1, 2013, Borrower Christine Jackson filed for Chapter 7 bankruptcy, to which she was entitled discharge under 11 U.S.C. § 727 on May 7, 2013. (See. Exs. 7 &8)

## III.    LEGAL STANDARD

Summary judgment is appropriate where the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[S]ummary judgment is appropriate—in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law." *Dempsey v. Atchison, Topeka and Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994), *cert. denied*, 513 U.S. 821 (1994); *Powers v. Runyon*, 974 F. Supp. 693, 696 (S.D. Ind. 1997). When determining whether an issue of material fact is present, the court considers the governing substantive law and the applicable burdens of proof. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## IV.    ARGUMENT

### A.  Borrowers cannot Recover under RESPA as a Matter of Law

Chase's Motion for Summary judgment should be granted. Borrowers have provided insufficient factual allegations to stave off summary judgment. Moreover, Borrowers cannot recover under the Real Estate Settlement Procedures Act ("RESPA") because Chase appropriately responded to the Borrowers' QWR and fully complied with RESPA. An entry of summary judgment is all the more appropriate because Chase did not make any servicing errors or miscalculations of Borrowers' monthly mortgage payments. Moreover, Borrowers' RESPA claim lacks merit because there is no evidence suggesting that the sufficiency of Chase's QWR response caused Borrowers' alleged

damages. RESPA regulates the real estate settlement process, including the servicing of home loans. *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 680 (7th Cir.2011). The purposes underlying RESPA are "to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges." 12 U.S.C.A. § 2601(a). To this end, RESPA requires mortgage servicers to provide borrowers with certain information when properly requested by a "Qualified Written Request" or QWR. *See* 12 U.S.C. § 2605(e).

### 1. *Borrowers have failed to Provide any Evidence Showing Chase Violated RESPA*

Not only is there absolutely zero evidence that Chase had a pattern or practice of violating RESPA, there is also no evidence that Chase violated RESPA in any way, shape, or form. Yet Borrowers allege that Chase violated RESPA due to the following: (i) an allegedly inadequate QWR response; (ii) by reporting Borrowers' default to consumer reporting agencies after the QWR was received; (iii) by continuing collection efforts after receiving Borrowers' QWR; and (iv) based on information and belief alone, that Chase has engaged in a pattern or practice of RESPA non-compliance.  (*See* First Amended Complaint, Dkt. 41, ¶¶ 70-73).

Addressing first points (*ii*), (*iii*), and (*iv*), Borrowers have provided insufficient factual allegations to stave off summary judgment. Under *(ii)*, there is no evidence that Chase reported Borrowers in default to any consumer reporting agency after Chase received Borrowers' QWR. And under *(iii)*, nothing in RESPA bars a loan servicer from continuing collection efforts after receiving a QWR. With regard to *(iv)*, there is no evidence to support Borrowers' claim that Chase violated RESPA in any regard, not to

11

mention the fact that nothing supports Borrowers' claim that Chase engaged in a pattern or practice of violating RESPA. Borrowers' theory that Chase should have allowed them to pay lower monthly payments because of an insurance miscalculation is directly at odds with the evidence.  Borrowers' claim that "Chase's automated annual escrow analysis software calculated the [Borrowers] projected 2010 insurance obligation based on the incorrect amount of $2,260.00 – the sum of both" the Allstate and Homelite insurance policies is counterfactual. (*See* First Amended Complaint, Dkt. 41, ¶ 13) The 2009 Escrow Disclosure Statement conclusively shows that Chase projected Borrowers' 2010 insurance to be $838.00. (*See* Ex. 11) Nothing indicates that Chase's 2010 projections were based on an expected homeowners' combined insurance premium of $2,260.00. In fact, Chase's calculations to determine the Target Escrow Balance and the Escrow Shortage would make no mathematical sense if Chase used the $2,260.00 combined projected insurance premium. And it goes without saying that if $2,260.00 was the projection used, there would have been a significantly higher Escrow Shortage than the one Chase calculated.

Furthermore, even if, for the sake of argument, Borrowers were able to show that Chase violated RESPA, this by no means equates to a finding that Chase committed a pattern or practice of violating RESPA. *See, e.g.*, *In re Maxwell*, 281 B.R. 101, 123 (Bankr.D.Mass.2002) (finding that evidence of two RESPA violations was insufficient to support a pattern or practice); *McLean v. GMAC Mortgage Corp.*, 595 F. Supp. 2d 1360, 1365-66 (S.D. Fla. 2009) *aff'd*, 398 F. App'x 467 (11th Cir. 2010) (concluding that borrowers presentation of evidence alleging that a mortgage servicer did not respond to two QWR's was not enough to show a pattern or practice of noncompliance); *In re Tomasevic*, 273 B.R. 682, 683 (Bankr. M.D. Fla. 2002) (holding that a single violation,

even if proved, would not constitute the necessary pattern or practice to permit recovery). Finally, Borrowers have presented no evidence of a standard or institutionalized practice of noncompliance by Chase—a required element to prove a pattern or practice of violating RESPA. *See McLean*, 595 F. Supp. 2d at 1365-66.

### 2. *What the Evidence does Show is that Chase Fully Complied with RESPA and adequately responded to Borrowers' QWR*

In the same way that the lack of evidence merits summary judgment in favor of Chase, the existence of Chase's QWR Response invalidates Borrowers' claim that Chase violated RESPA. The servicer of a mortgage is first required to respond to a borrower's QWR within 20 days to inform borrower that the QWR was received. 12 U.S.C. § 2605(e)(1)(A) [effective September 30, 1996 to July 20, 2011]. Within 60 days after receiving a qualified written request, the servicer must take one of three actions:

(1) make appropriate corrections to the borrower's account and notify the borrower in writing of the corrections;

(2) investigate the borrower's account and provide the borrower with a written clarification as to why the servicer believes the borrower's account to be correct; or

(3) investigate the borrower's account and either provide the requested information or provide an explanation as to why the requested information is unavailable.

*See* 12 U.S.C. § 2605(e)(2)(A), (B), and (C). The statute allows servicers to choose a method of response, there is no duty to comply with all three. *See, e.g. Elkins v. Ocwen Federal Savings Bank*, No. 06C0823, 2006 WL 3147716, *2 (N.D.Ill. Oct.27, 2006).

First, Chase timely responded to Borrowers' QWR within the 20 and 60 day deadline then proscribed by RESPA. *See* 12 U.S.C. § 2605(e)(1) & (2) [effective September 30, 1996 to July 20, 2011]. There can be no dispute that within 20 days of

Borrowers' January 10, 2011 QWR, Chase sent Borrowers a January 27, 2011 letter

informing Borrowers that Chase had received the QWR and were investigating the issue,

and on February 28, 2011, within 60 days after receiving Borrowers' QWR, Chase

provided Borrowers with information sufficient enough to meet RESPA. (*See.* Exs. 9 and

13)

   Second, the substance of what Chase provided was sufficient as a matter of law.

In their QWR, Borrowers accused Chase of making an unauthorized 1,422.00

disbursement from their escrow and demanded that Chase lower their monthly

payments accordingly. (*See* Ex. 5) There can be no dispute that Chase's QWR Response

attached Borrowers' detailed loan history and escrow accounting since 2005. Also

indisputable is that the attached documents contained a line-item explanation that the

$1,422.00 escrow deduction on February 17, 2009, was an authorized disbursement for

homeowners' insurance. Indeed, what could be clearer than this:

| Reference # | Tran Date Principal Amt | Effective Date Interest Amt | Due Date Escrow Amt | Total Tran Amt Fees/Other Amt | Transaction Description Suspense Amt | Principal Bal | Escrow Bal |
|---|---|---|---|---|---|---|---|
| | | | Activity for Period   1/1/2000   –   2/21/2011 | | | | |
| 74 | 2/17/2009 | 2/17/2009 | 2/1/2009 | $1,422.00 | HOMEOWNERS INSURANCE | | |
| | $0.00 | $0.00 | $1,422.00 | $0.00 | | $188,995.83 | |

   The authorized nature of the transaction should have been self-explanatory to the

Borrowers—especially to Borrower Christine Jackson, who was an attorney specializing

in RESPA-related areas of the law. (*See* First Amended Complaint, Dkt. 41, ¶ 5) If not,

Chase provided Borrowers with a Customer Service Department's number. At any rate,

the fact remains that Borrowers should have realized—at least by the time they received

Chase's response—that the February 17, 2009 escrow deduction of $1,422.00 for

"HOMEOWNERS INSURANCE" was the same amount that Allstate had refunded the Borrowers on March 2, 2009.

But Borrowers' argument that they maintained their ignorance throughout over the nature of the $1,422.00 payment on February 17, 2009 becomes even less availing when considering that from 2005 to 2008, Chase would paid Borrowers' annual Allstate homeowners' insurance premium on close to the same date:

> ***February 16, 2005***: $971.00 (*See* Stipulated Exhibit 2, pg. 15)
> ***February 16, 2006***: $1,029.00 (*See* Stipulated Exhibit 2, pg. 13)
> ***February 16, 2007:*** $915.00 (*See* Stipulated Exhibit 2, pg. 11)
> ***February 19, 2008***: $924.00 (*See* Stipulated Exhibit 2, pg. 9)

The broader point here is that Chase provided Borrowers with more than enough information to determine what the 1,422.00 deduction from their escrow in February of 2009 was for. The purpose of RESPA is to ensure that consumers are provided with "greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges." 12 U.S.C.A. § 2601(a). RESPA thus give consumers the right to receive information explaining the "nature and costs" of what is being charged—precisely the type of information Chase provided the Borrowers. RESPA does not create the right to continually be told the obvious; nor does it impose a continually obligation to do so.

Borrowers will likely argue that Chase failed to provide detailed information in response to each of their eight inquiries. Chase offered what RESPA required Chase to offer, which was the information requested by Borrowers that *related to the servicing of the loan.* 12 U.S.C.A. § 2605(e)(1)(A); *Mayer v. EMC Mortgage Corp.*, WL 1607443 (N.D. Ind. Apr. 22, 2014). The term 'servicing' means receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan...." 12 U.S.C. § 2605(i)(3);

15

*MorEquity, Inc. v. Naeem*, 118 F.Supp .2d 885, 901 (N.D.Ill.2000) (a request for information relating to validity of loan documents was not a request for information relating to servicing of the loan). Several of Borrowers' requests were broad and sought information well beyond those that relate to servicing. Chase provided Borrowers with a copy of their entire loan history that detailed all of the payments made on their account along with the contact information of a Chase representative that Borrowers could contact if they had additional questions. Courts have recently held that supplying a borrower with the loan history was sufficient under RESPA. *See Vitela v. IndyMac Mortgage Servs.*, 2014 WL 2863147 (E.D. Mo. June 24, 2014) (finding no RESPA violation occurred when bank provided a payment history that showed the way each payment was applied to principal, interest, and escrow and indicated any late charges accrued); see also *O'Connor v. Nantucket Bank*, 992 F. Supp. 2d 24, 37 (D. Mass. 2014) (bank complied with its requirements under RESPA where it provided a loan history, contact person at the bank, and a copy of the note and mortgage).

Finally, it is important to note that Chase had the absolute right under Section 2609(a)(2) of RESPA and the Mortgage to require additional escrow deposits to avoid actual or projected deficiencies and shortages in the Borrowers' escrow account that are caused by making payments on the debtor's behalf where the debtor does not have sufficient funds on deposit in the escrow account.

### 3. Borrowers' RESPA claims fail because no there is no causal connection between the violation and alleged actual damages

RESPA authorizes "actual damages to the borrower as a result of the failure [to comply with the statute]." 12 U.S.C. § 2605(f)(1)(A). A plaintiff claiming a RESPA violation must establish "actual damages" as a result of the failure to respond. As an

initial matter, Borrower Christine Jackson has declared bankruptcy. As a result, her alleged financial damages have been discharged. Moreover, Borrowers have failed to plead emotional distress damages in the Amended Complaint, and did not identify any emotional distress damages in their Rule 26(a) disclosures. Borrowers are consequently barred from seeking emotional distress damages. *See Webb v. Chase Manhattan Mortgage Corp.*, 2008 WL 2230696, *14 (S.D. Ohio May 28, 2008) (finding that plaintiff's RESPA claim failed on summary judgment  because plaintiff failed to plead her emotional distress damages in the complaint or identify them in her initial disclosures). Under Rule 37, the exclusion of nondisclosed evidence is automatic and mandatory unless it was justified or harmless. *Tribble v. Evangelides*, 670 F.3d 753 (7th Cir. 2012).

Additionally, Borrowers' claim of actual damages based on emotional distress of the foreclosure proceeding is not causally related to the alleged violations of RESPA nor established by any evidence. In other words, Chase's alleged failure to respond to the Borrowers' QWR did not "cause" the foreclosure, nor is there any evidence suggesting so. What caused the foreclosure was Borrowers refusal to pay their monthly mortgage payments. And even if there was an actual error on Borrowers' monthly mortgage amount, this does not justify Borrowers' actions of excusing themselves from paying any more monthly mortgage payments. *See Allen v. United Fin. Mortg. Corp.*, 660 F.Supp.2d 1089, 1098 (S.D.Cal.2009) (finding that the plaintiff's loss of property appeared to have been caused by his default and not the alleged RESPA violations); *Lee v. Equifirst Corp.*, No. 3:10–809, 2010 WL 4320714, at *9 (M.D.Tenn. Oct.26, 2010) (unpublished) ("It is clear that the foreclosure was caused by the plaintiff's inability to pay the amount she owed; knowledge of why certain payments were applied in certain

ways [the information she sought in her unanswered QWR request] had no effect on her ability to make loan payments").

### B. Borrowers Good Faith and Fair Dealing also Fails and Merits Entry of Summary Judgment in Favor of Chase

Summary judgment should also be entered on Borrowers' Breach of the Duty of Good Faith & Fair Dealing. Indiana has never recognized the existence of an implied covenant of good faith and fair dealing in the context of a loan-servicing agreement. "Under Indiana law, a duty of good faith and fair dealing is implied only in certain kinds of contracts, such as insurance contracts, employment contracts, contracts under the Uniform Commercial Code as adopted in Indiana, and contracts that are 'ambiguous as to the application of the covenants.'" *ArcAngelo, Inc. v. Directbuy, Inc.*, 2013 WL 6095678, *3 (N.D. Ind. Nov. 20, 2013) (citing *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 918 (Ind. Ct. App. 2011)); *Allison v. Union Hosp., Inc.*, 883 N.E.2d 113, 123 (Ind. Ct. App. 2008) (recognizing that Indiana courts have recognized an implied covenant of good faith and fair dealing in contract law, but generally only in limited circumstances involving employment contracts and insurance contracts). Indiana does not impute a duty of good faith and fair dealing into every contract. *Allen v. Great Am. Reserve Ins. Co.*, 766 N.E.2d 1157, 1162 (Ind. 2002).

Another key point is that the general rule in Indiana is that "the mere existence of a relationship between parties of a bank and customer or depositor does not create a special relationship of trust and confidence." *Peoples Trust Bank v. Braun*, 443 N.E.2d 875, 879 (Ind. Ct. App. 1998). Mortgages do not transform a traditional debtor-creditor relationship into a fiduciary relationship absent intent by the parties to do so. *Judd v. First Federal Sav. And Loan Ass'n*, 710 F.2d 1237, 1241 (7th Cir. 1983). And even if

Indiana did recognize a Breach of the Duty of Good Faith & Fair Dealing claim, there is no evidence suggesting Chase breached such a duty. As explained above, Chase never mishandled the funds in the escrow account.

### V.      CONCLUSION

For the foregoing reasons, the Court should grant Chase summary judgment on Borrowers' claims.

Respectfully Submitted,

/s/ Joel T. Nagle
David J. Jurkiewicz, Attorney No. 18018-53
Brian S. Jones, Attorney No. 29578-49
Joel T. Nagle, Attorney No. 27269-49
**BOSE MCKINNEY & EVANS LLP**
111 Monument Circle, Suite 2700
Indianapolis, IN  46204
(317) 684-5364 / (317) 223-0364 (fax)

djurkiewicz@boselaw.com
b.jones@boselaw.com
jnagle@boselaw.com

*Attorneys for JPMorgan Chase Bank, N.A.*

### *Certificate of Service*

I hereby certify that on September 17, 2014, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Ryan Frasher – rfrasher@frasherlaw.com

*/s/Joel T. Nagle*

2497714_1