## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| STEPHEN H. PERRON, et al. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 1:12-CV-1853-TWP-TAB |
| | ) | |
| JP MORGAN CHASE BANK, N.A. | ) | |
| fka, CHASE HOME FINANCE, LLC | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' RESPONSE IN OPPOSITION
## TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

_s/ Ryan Frasher_
Ryan Frasher
The Frasher Law Firm, P.C.
155 East Market Street, Ste 450
Indianapolis, IN 46204
317-634-5544
317-630-4824 (fax)
rfrasher@frasherlaw.com

**ATTORNEY FOR PLAINTIFF**

1

Plaintiffs Steven Perron and The United States Bankruptcy Trustee of The Southern District of Indiana[1] ("Plaintiff" or "Plaintiffs" or "Home Owners" or "Perron" or "Jackson"), files this Response In Opposition To Chase's Motion For Summary Judgment.

# I
## PRELIMINARY STATEMENT

Chase's inept loan servicing and inability to correct an escrow account it knew to be wrong caused a nightmare for the Plaintiffs. Chase threatened foreclosure despite the Plaintiffs faithfully paying on their loan.[2] Chase ignored the Plaintiffs' repeated attempts to explain and document to Chase that Chase had made a huge error. Furthermore, Chase should not have put the Plaintiffs' loan in a default status where Plaintiffs paid the agreed to and correct amount of the December 2010 mortgage at a local branch. Chase also failed to respond appropriately to Qualified Written Requests and Chase failed to take corrective actions with respect to the servicing of the mortgage loan. Chase's failure to appropriately respond to the Qualified Written Requests caused Plaintiffs significant damage.

Perron is a retired IRS criminal investigator that spent thirty years reviewing financial documents such as are involved here. The same applies to Jackson. In addition, Jackson was a consumer protection attorney litigating mortgage and loan servicing abuse cases. She represented consumers against banks and loans servicers (such as Chase) for violations of various federal laws like RESPA.

Chase's actions or inactions caused a catastrophic cascading effect that precipitated a divorce, bankruptcy, health issues and closure of a Jackson's consumer law practice.

---

[1] Christine Jackson was an original Plaintiff until the bankruptcy estate took over her claim. Her name will appear throughout the memorandum.
[2] Chase has yet to ever file the foreclosure throughout this litigation.

Plaintiff's direct evidence, and the reasonable inferences drawn therefrom, demonstrate that a jury could reasonably conclude that Chase violated of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. Section 2601 *et seq*. and its duty of good faith and fair dealing.

## II
## BACKGROUND OF CLAIMS

### A.      Procedural Background

Plaintiffs' First Amended Complaint is filed under the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. §2601 *et. seq*., Breach of Contract, Negligent Supervision and Breach of Good Faith and Fair dealing to recover actual, statutory, and punitive damages, court costs, and attorney's fees. [Dkt. 1] On March 15, 2014 Defendant filed a Motion To Dismiss three of the causes of action in Plaintiffs' complaint. [Dkt. 14] The Court granted in part and denied in part the Motion To Dismiss. [Dkt. 36] On April 16, 2014 the Plaintiffs filed their First Amended Complaint. [Dkt. 41] The remaining two claims include RESPA and Breach of Good Faith and Fair Dealing. Also during this litigation, Ms. Jackson's claims were assigned to the Bankruptcy Trustee of The Southern District of Indiana. [Dkt. 42] Both parties filed a respective motion for summary judgment. [Dkts. 59 & 62] Respective Responses were to be filed no later than October 31, 2014. [Dkt. 68] A final pre-trial is set for May 20, 2015 and trial by jury is set for June 15, 2015. [Dkt. 51]

### B.      RESPA Background

Mortgage lenders establish mortgage escrow accounts to collect and hold money they receive from residential mortgage-holders to pay taxes and insurance on mortgaged properties

when those payments fall due.[3] The escrow arrangement starts with an estimate of the annual tax or other item to be paid from the account. Due to the fairly complex nature of these estimates, especially when numerous items are involved, the lender generally assumes responsibility for their calculation. The estimate is then divided by the number of months remaining before the payment is due. As the borrower makes monthly escrow payments, those payments are accumulated in the account until payment of the item or items are due. Most escrow accounts do not provide for interest payments to the borrower.[4]

Both parties' interests are vulnerable under mortgage escrow arrangements.[5] The mortgage lender or servicer may be compelled to expend its own funds to protect the collateral if the borrower does not make the necessary payments at the appropriate time. *At the same time, however, the borrower has little control over the amount of the escrow assessment. As a result, an unscrupulous lender has the opportunity to extract an involuntary interest free loan by requiring the borrower to pay more than is necessary to cover the borrower's tax and insurance obligations. A lender with numerous customers could realize substantial profits from the use of the funds gained through small individual overcharges.*[6]

In an attempt to protect the interests of both parties to these mortgage escrow transactions, Congress enacted the federal Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 et seq. ("RESPA").[7] RESPA allows the lender to collect monthly escrow payments in excess of the amounts actually necessary to pay tax and insurance premiums as they come due. The amount of the excess, however, is limited to the amount that is required to accumulate the estimated payment two months before its actual due date. This excess payment or "cushion" allowed by RESPA provides the lender with a degree of protection against potential delinquent payments. Also, by limiting the lenders cushion to an extra two months' worth of the annual

---

[3] *Aitken v. Fleet Mortg. Corp.*, 1992 U.S. Dist. LEXIS 1687, 1-3 (N.D. Ill. Feb. 12, 1992)
[4] *Id*.
[5] *Id*.
[6] *Id*. (Emphasis added)
[7] *Id*.

amount necessary to pay taxes and insurance premiums, RESPA mitigates the risk of an assessment that is tantamount to an involuntary interest free loan.[8]

### III
### STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1.  At the start of this litigation Stephen H. Perron and Christine M. Jackson ("Homeowners") were consumers who resided in Hamilton County, Indiana. Ex. A - Affidavit of Perron, ¶ 1

2.  Mr. Perron is a retired criminal investigator for the Internal Revenue Service. Affidavit of Perron, ¶ 2

3.  Ms. Jackson was an attorney who represents consumers with financial disputes against their lenders and loan servicers, including homeowners in foreclosure. Ex. B - Affidavit of Jackson, ¶ 1

4.  Defendant JPMorgan Chase Bank, N.A. ("JPMC") is chartered as a national bank, regulated by the Office of the Comptroller of Currency (OCC) and headquartered at 1111 Polaris Parkway, Columbus, Ohio 43240. JPMC acquired Chase Home Finance, LLC on May 1, 2011. Chase Home Finance, LLC ("Chase") is a Delaware Limited Liability Company that withdrew its Indiana business license on May 16, 2011. Chase is an agent for FANNIE MAE (the alleged holder of the note at issue) hired to collect mortgage payments, to interact with borrowers to account for payments made and expenses charged per the terms of the note and mortgage. Chase's duties as loan servicer are governed by regulations which can be viewed on FANNIE MAE's website, https://www.efanniemae.com/home/index.jsp. [Dkt. 42] Answer, ¶6

---

[8] *Id*.

5.      The Homeowners have a first mortgage on their personal residence which was serviced by Chase Home Financing LLC ("Chase") during 2008 through present. [Dkt. 42] Answer, ¶ 7

6.      Based on information and belief, Chase Home Financing LLC was acquired by JPMC in May of 2011 and JPMC now services the Homeowners' loan. [Dkt. 42] Answer, ¶8

7.      In 2008, Homeowners' scheduled monthly mortgage payment, including principal, interest and escrow, was $1,469.20 and in 2009, was $1,463.23.  Homeowners paid their monthly mortgage payment by automatic electronic bank transfer. Affidavit of Perron, ¶ 3

8.      Sometime in February 2009, Chase deducted $1,422.00 from the Homeowners' escrow account, and labeled the deduction as "Homeowner's Insurance." Affidavit of Perron, ¶ 4; [Dkt. 42] Answer, ¶11; Ex. I Chase's Response To First QWR, p. 9

9.      Then in March 2009, Chase deducted $838.00 from the Homeowners' escrow account for the Homeowners' actual Homeowners' insurance premium. Affidavit of Perron, ¶ 4; Ex. I Chase's Response To First QWR, p. 7

10.      In December 2009, Chase's automated annual escrow analysis software program calculated the Homeowners' projected 2010 insurance obligation based on the incorrect amount of $2,260.00 – the sum of both amounts labeled as Homeowners' Insurance from the Homeowners' 2009 escrow account. Affidavit of Perron, ¶ 5

11.      The Homeowners' actual 2009 homeowners' insurance premium was only $838.00. Affidavit of Perron, ¶ 6

12.      Due to the incorrect projection for Homeowners' 2010 insurance premium, Chase computed a phantom escrow "shortage" of $802.28 as of December 31, 2009. Affidavit of Perron, ¶ 7

13.     Consequently, Chase's escrow software program added an additional $66.00 to each of the Homeowners' 2010 scheduled monthly mortgage payments to recoup the phantom 2009 escrow "shortage". Affidavit of Perron, ¶ 8

14.     Chase calculated the Homeowners' 2010 scheduled monthly mortgage payment to be $1,499.01. Affidavit of Perron, ¶ 9

15.     The Homeowners made, and Chase accepted, by automatic electronic bank transfers, in the amount of $1,469.20 from January 2009 through November 2011. Affidavit of Perron, ¶ 10

16.     On or about November 23, 2010, Homeowners logged onto the Chase online account website to change the bank account from which Chase should deduct their monthly mortgage payments.  At this time, Homeowners first discovered that Chase miscalculated the amount of their 2010 scheduled mortgage payments due to the improper inclusion of the February 2009 $1,422.00 "Homeowners' insurance" charge in Chase's 2010 escrow calculation. Affidavit of Perron, ¶ 11

17.     The online account information also showed that despite the failure of the Homeowners to increase their 2010 monthly payments (to include the incorrectly computed escrow "shortage" amount), the Homeowners' 2010 escrow account ended the year with $250.05 of excess funds that would be refunded to Homeowners in January 2011. Affidavit of Perron, ¶12, [9]

18.     Also, the online account information showed that Chase calculated the Homeowners' 2011 scheduled monthly mortgage payment to be $1,399.23. Affidavit of Perron, ¶ 13

---

[9] Ex. C – Overage Check For $250.05 To Plaintiffs

19.     After many hours of research to uncover the above error, Homeowners contacted a Chase representative by phone to alert Chase to the error and to determine the correct amount that Homeowners' should pay for their December 2010 monthly payment. Affidavit of Perron, ¶ 14

20.     Homeowners explained the error to the Chase representative who acknowledged that she saw how the error occurred.  Homeowners asked Chase what to do about their December 2010 payment because the online website would only allow Homeowners to set up an auto pay in the amount of $1,499.01, however, their 2010 escrow account already had a $250.05 surplus and their 2011 monthly payment was calculated to be only $1,399.23. Affidavit of Jackson, ¶ 2

21.     Chase told Homeowners that it would code their account to accept a payment in the amount of $1,399.23 for December 2010 and instructed Homeowners to make their December payment at a local Chase branch.  Chase also stated that the new automatic monthly electronic bank transfer from the new bank account would be effective January 2011, in the amount of $1,399.23. Affidavit of Jackson, ¶ 3, [10]

22.     Homeowners made a payment in the amount of $1,399.23 at a local Chase bank branch on December 3, 2010. Affidavit of Jackson, ¶ 4

23.     On or about December 28, 2010, Homeowners received a check from Chase in the amount of $250.05 representing the amount their 2010 escrow account overage. Affidavit of Jackson, ¶ 4

24.     On or about January 10, 2011, Homeowners received eight (8) form letters from Chase bank:  Presuit Notice dated 01/04/2011 to Stephen H. Perron via certified mail; Presuit Notice dated 01/04/2011 to Christine M. Jackson via certified mail; Presuit Notice dated 01/04/2011 to Stephen H. Perron via first class mail; Presuit Notice dated 01/04/2011 to

Christine M. Jackson via first class mail; Notice of Intent to Foreclose dated 01/04/2011 to

Stephen H. Perron via first class mail; Notice of Intent to Foreclose dated 01/04/2011 to

Christine M. Jackson via first class mail; ACH Program Termination dated 01/04/2011 to Perron

and Jackson via first class mail; Letter, dated 01/05/02011, stating the Account was in Default

and sent to Perron and Jackson via first class mail; Letter, dated 01/10/ 2011, stating the Account

was now 2 payments behind for December 2010 and January 2011 sent to Perron and Jackson

via first class mail. Affidavit of Jackson, ¶ 5,[11]

      25.    Upon reviewing the letters and their online account information, Homeowners

discovered that Chase did not apply the Homeowners' December 2010 payment towards their

December monthly payment obligation. Affidavit of Perron, ¶ 15

      26.    Instead, Chase put Homeowners' December 2010 payment, in the amount of

$1,399.23, into a "suspense" account.  Chase then coded the Homeowners' Account as being in

default. Affidavit of Jackson, ¶ 6

      27.    Based on information and belief, once Chase's payment collection software

system codes an account as "in default," the program is designed to terminate any ongoing

automatic payments set up by the Homeowner. Affidavit of Jackson, ¶ 7

      28.    Consequently, even though Chase had authority to process the Homeowners'

January electronic payment order, Chase's system did not process their January 2011 mortgage

payment because it incorrectly coded the Homeowners' Account to be "in default." Affidavit of

Jackson, ¶ 8,[12]

---

[10] Ex. D – Chase Call Log Page, bates 000064
[11] Ex. E – Default Letters
[12] Ex. F – Account Delinquent & ACH Cancellation Letters From Chase

29.    Homeowners first learned that Chase did not process their January 2011 mortgage payment until after receipt of the above letters. Affidavit of Jackson, ¶ 9, [13]

30.     Homeowners became extremely upset and anxious because they knew through Jackson's law practice that loan servicers do not have adequate procedures in place to review and correct errors that loan servicers make to customer accounts. Affidavit of Jackson, ¶ 10

31.    On or about January 10, 2011, Homeowners sent Chase a Qualified Written Request (QWR) pursuant to the Real Estate Settlement Procedures Act (RESPA) informing Chase of the error and requested that Chase reverse the error and correct Homeowners' Account. Affidavit of Jackson, ¶  11,[14]

32.    Chase acknowledged receipt of Homeowner's "correspondence" by a letter dated January 27, 2011.[15]

33.    On or about January 28, 2011, Homeowners received the first call from Chase's collection department.  Perron answered the phone, heard that the call was from Chase and then hung up the phone. Affidavit of Perron, ¶ 16

34.    From February 2011 through the time the Homeowners' phone number was disconnected, Chase's automated collection "robo-call" program dialed the Homeowners' phone at least two (2) times per day every day of the week.  Most of the time, Homeowners did not answer the phone. Affidavit of Jackson, ¶ 12

35.    On or about February 8, 2011, Jackson took a collection call from Diana Giron, an employee from Chase's Costa Rica call center. Giron stated that Homeowners had $1,277.37 in their "suspense" account and that Homeowners were behind three (3) payments (December 2010, January 2011, and February 2011). Affidavit of Jackson, ¶ 13

---

[13] Ex. E – Default Letters, and Ex. F –  Account Delinquent & ACH Cancelled Letters From Chase
[14] Ex. G – First QWR

36.     Jackson spent about 15 minutes trying to explain Chase's escrow error to Ms. Giron.  However, Ms. Giron continued to read from her collection "script," ignoring Jackson's explanation. Affidavit of Jackson, ¶ 14

37.     Ms. Giron informed Jackson that she would have a bad credit report and face foreclosure if she did not pay Chase all the money it stated was owed. Affidavit of Jackson, ¶ 15

38.     In an attempt to make the collection robo-calls stop, on or about February 24, 2011, Jackson took another collection call from Carissa, an employee from Chase's Home Department.  Jackson spent approximately 25 minutes on the phone. Affidavit of Jackson, ¶ 16

39.     Jackson explained the error made by Chase and informed Carissa that a QWR had been mailed to Chase requesting the error to be corrected. Affidavit of Jackson, ¶ 17

40.     Jackson also requested that Chase code their Account to eliminate the daily robo-calls.  Carissa stated that she would continue to call Homeowners weekly until the problem was resolved. Affidavit of Jackson, ¶ 18

41.     Carissa attempted to convince Jackson to make at least one (1) mortgage payment to keep the Account from foreclosure.  Carissa stated that if the Account was only one (1) month behind a foreclosure would not be initiated. Affidavit of Jackson, ¶ 19

42.     Jackson explained that if she made any payment to Chase before the Account error was corrected, Chase's accounting software program would continue to charge the Account for default fees and the Account would continue to remain in default.  Jackson stated that Chase was not entitled to late and default fees due to its error to the Homeowners' Account. Affidavit of Jackson, ¶ 20

---

[15] Ex. H – QWR Acknowledgment Letter From Chase

43.     Jackson told Carissa that if Chase did not correct the account as a result of the Homeowners' QWR, the only way to permanently fix the problem would be through a lawsuit. Affidavit of Jackson, ¶ 21

44.     Carissa told Jackson to call Chase's Customer Service Department at least once per week to be sure that they were working on the error.  Jackson informed Carissa that she would not do so as it was a waste of time because the phone representatives at Chase's Customer Service Department only read from a pre-determined script and had no authority to correct errors. Affidavit of Jackson, ¶ 22

45.     On or about February 28, 2011, Chase sent Homeowners' a purported response to their QWR.  The response was a form letter from Chase Home Lending and stated that a loan history and escrow statements were enclosed.[16]

46.     Chase's response did not reference the Homeowners' specific error and request for correction. Affidavit of Jackson, ¶ 23

47.     Based on Jackson's information and belief, Chase has a pattern and/or  practice of failing to properly review QWRs from borrowers and routinely replies to borrowers' specific requests with a standardized form letter that does not address the borrowers' specific concerns. Affidavit of Jackson, ¶ 24

48.     On or about April 27, 2011, Homeowners sent a second QWR to Chase, again asking Chase to correct their error and to pay damages for Chase's unlawful actions. Affidavit of Jackson, ¶ 25,[17]

49.     Chase received the second QWR on May 2, 2011.

---

[16] Exhibit I  – Chase's Response To First QWR
[17] Exhibit J  – Second  QWR

50.     **Chase never responded to Homeowners' second QWR. Affidavit of Jackson, ¶ 26**

51.     On or about October 25, 2011, Homeowners spent two (2) hours on the phone with representatives for Chase attempting to determine 1) the correct address to mail a new QWR and 2) why they could not access their account information online. Affidavit of Jackson, ¶ 27, [18]

52.     During this conversation, the Homeowners were repeatedly transferred between the Chase Customer Care department and the Chase Loss Mitigation department. Affidavit of Jackson, ¶ 28

53.     In summary, no Chase representative was able to tell the Homeowners the correct address to be used to mail a QWR. Affidavit of Jackson, ¶ 29

54.     Furthermore, the Chase Loss Mitigation representative harassed the Homeowners continuing to tell them that 1) it did not matter whether Chase had made an error, 2) that Chase had a "valid" foreclosure against Homeowners and 3) that it did not matter what a judge determined the Homeowners owed on the Account because the Homeowners would have to pay Chase everything it wanted if they wanted to keep their home. Affidavit of Jackson, ¶ 30

55.     Homeowners experienced significant stress and frustration beginning when Chase did not properly reply to their first QWR because Homeowners knew due to Jackson's consumer law practice that if Chase did not correct the error as a result of their QWR, it would take many years to force Chase to correct its error.  In the meantime, the Homeowners' credit scores would be ruined, as would their ability to obtain credit, car insurance and property insurance at reasonable rates. Affidavit of Jackson, ¶ 31 and Affidavit of Perron ¶ 17

---

[18] Ex. M – Transcript of Conversation between Plaintiffs and Chase Reps.

56.     The financial and emotional stress caused by this situation adversely affected the Homeowners' marriage and Perron filed for divorce in March of 2012. Affidavit of Perron, ¶ 18

57.     Based on information and belief, Jackson's employment applications with the Consumer Financial Protection Bureau and the Federal Reserve Board were adversely affected by Chase's negative credit reporting. Affidavit of Jackson, ¶ 32

58.      Chase's failure to correct the error as requested in the QWR, affected Jackson's ability to practice law as her credit lines were reduced, she was denied access to new credit, she experienced anxiety, excessive stress and her Crohn's disease flared, requiring hospitalization and a 4 month leave of absence from work. Affidavit of Jackson, ¶ 33

59.     In January 2011 Ms. Jackson had available credit with Bank of America in the amount of $20,258 and $18,208 with her Citibank credit card. By May of 2011 her available credit was reduced to $0.00 for a net loss of $38,466 in available credit. No other events other than Chase's negative reporting that the mortgage being in default could have contributed to the credit reduction. Affidavit of Jackson, ¶ 34

60.     Jackson's hourly billable rate as an attorney in 2010 and 2011 was $300 per hour. Jackson spent 10.7 hours attempting to see how Chase made the mistakes and drafting the two QWRs. This was time away from her law practice. Jackson's opportunity costs were $3,210. Affidavit of Jackson, ¶ 35

61.     Mr. Perron also had time away from employment. He worked as an investigator on legal mortgage cases for attorneys reviewing account histories at the rate of $100 per hour. He estimates he spent 9 hours trying to see how Chase made the mistakes and reviewing the QWRs. Perron's time away from employment for analyzing documents and reviewing the QWRs totaled at least $900. Affidavit of Perron, ¶ 19

62.     Plaintiffs also paid $5.54 in postage for the first QWR and $5.75 for the second QWR.  Affidavit of Perron, ¶ 20

63.     In late 2013, Chase made a demand to Plaintiffs. As a result of such demand, Perron worried that while he was on extended vacation to Mexico, Chase would foreclosure and would enter the home and remove his possessions. Perron, through Jackson's law practice, has seen banks do this to consumers where the house appears to be unoccupied. Thus, starting in January 2014 Perron rented a storage unit to contain the majority of his belongings.  In 2014 he has paid a total of $2,032.60. Affidavit of Perron, ¶ 21, [19]

64.     Jackson believed that Chase would or could appropriately apply the correct mortgage payment to correct the account in December 2010 as agreed to by Plaintiffs and Chase. Affidavit of Jackson, ¶ 36

65.     Perron was furious at Jackson for believing that based on her conversation with the Chase representative that Chase would or could apply the payment correctly. Affidavit of Perron, ¶ 22

66.     Perron's cynicism toward Chase came from his and Jackson's work on other RESPA cases involving loan services such as Chase. Affidavit of Perron, ¶ 23

67.     Perron's anger and blame toward Jackson precipitated into many arguments over the next year. Affidavit of Perron, ¶ 24

68.     Also, the reduction of Jackson's credit line meant Jackson could not afford to keep her practice afloat. This raised tensions ever more so as Jackson's financial troubles were imminent without her credit line to run the business. Affidavit of Jackson, ¶ 37

69.     Because of stress in the household at this time, Perron filed for Divorce in March of 2012. Affidavit of Perron, ¶ 25

70.     They were married for 25 years at that time. Affidavit of Perron, ¶ 26

71.     But for Chase's mistake, Plaintiff would still be married. Affidavit of Jackson, ¶ 38 and Affidavit of Perron, ¶ 27

72.     Jackson has had a significant reduction in her production at work due to loss of concentration, crohn's flair up due to stress, medical leave and depression. At one point Jackson sought the assistance of the Judges Lawyers Assistance Program ("JLAP") because of the stress of Chase's error had caused and the stress of her declining financial situation where her credit line was reduced by $38,466. JLAP recommended that Jackson close her practice before the stress she was under caused her to make a mistake. JLAP referred her to counselor Lois Bushong of Quiet Streams Counseling at 14074 Trade Center Drive, Ste. 225, Fishers, IN 46038. Counselor Bushong recommended that Jackson close her law practice because of Jackson's health. Affidavit of Jackson, ¶ 39

73.     Jackson was also seen before and after Chase's mistake by Kimberly R. Gatzimos, M.D. at 1650 W. Oak Street, Zionsville, IN 46077. Dr. Gatzimos put her on four months of medical leave in 2012 because of her medical condition which was triggered by the stress caused by Chase's mistake. Affidavit of Jackson, ¶ 40

74.     Jackson closed her limited liability corporation on July 1, 2013 based on the recommendation of JLAP, Counsel Bushong and Dr. Gatzimos. In 2012 Jackson estimates her lost income at $75, 600 due to Chase's mistake. In 2013 she estimates her lost income also to be at $75,600. This totals $151,200. Affidavit of Jackson, ¶ 41

75.     The Plaintiffs did not recall receiving the $1,422.00 refund check a year earlier in March of 2009. Affidavit of Jackson, ¶ 42 and Affidavit of Perron, ¶ 28

---

[19] Ex. K – Storage Unit Invoice

76.     Plaintiffs did not discover this until their Attorney Ryan Frasher met with Chase's Attorney Ted Nowacki pre-filing of the suit. Affidavit of Jackson, ¶ 42

77. Chase also force placed a lesser insurance policy after default. In the spring of 2013 a hail storm damaged the house at 1235 E. 106th St, Indianapolis, IN 46280-1461. Eagle Adjusting Services, Inc provided an estimate of repairs. The earlier policy before default provided a greater replacement cost clause. The force placed insurance policy only provided $1% replacement cost at $2,980.00. The estimate was for $12,286.00 Perron received an insurance check for about $4,500. There was a shortfall of about $7,500. Also the premium was higher for the force placed insurance at $2,257 where previous years the premium was only $838.00. Affidavit of Perron ¶29, [20], [21]

## IV

## ARGUMENTS AND AUTHORITIES

### A.    Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[22] A party seeking summary judgment has the initial burden of establishing that there is no genuine dispute as to any material fact.[23] After a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial.[24] In response to summary judgment, a non-movant cannot rest on its pleadings. Rather, a non-movant must provide evidence on which the jury or court can find in its favor.[25] In acting on a motion for

---

[20] Ex. L – Roof Estimate
[21] Ex. N -  Declarations of Force Placed Insurance
[22] FED.R.CIV.P 56(a).
[23] *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed. 2d 265(1986).
[24] *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986).
[25] *Maclin v. SBC AmeriTech,* 520 F.3d 781, 786 (7th Cir. 2008).

summary judgment, the applicable substantive law will dictate which facts are material.[26] If it is clear that a party will be unable to satisfy the legal requirements necessary to establish its case, summary judgment is not only appropriate, but mandated.[27] Failure to prove one essential element necessarily renders all other facts immaterial.[28] The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing the absence of evidence to support the non-moving party's case.[29]

**B.    RESPA**

RESPA establishes the requirements for how a mortgage loan servicer or lender must conduct its post-closing servicing of the loan. 12 U.S.C. §2605(e) details the duties and statutory obligations of a loan servicer or lender in receiving and responding to borrower written inquiries, providing the following:

(e) Duty of loan servicer to respond to borrower inquiries.

(1) Notice of receipt of inquiry.

> (A) In general. If any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 20 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period.
>
> (B) Qualified written request. For purposes of this subsection, a qualified written request shall be a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that--
>
> > (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and

---

[26] *National Soffit & Escutcheons, Inc. v. Superior Systems, Inc.*, 98 F. 3d 262, 265 (7th Cir. 1996).
[27] *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca, LP*, 324 F.3d. 518, 520 (7th Cir. 2003).
[28] *See Celotex*, 477 U.S. at 323.
[29] *See Celotex*, 477 U.S. at 325.

(ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

(2) Action with respect to inquiry. Not later than 60 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request under paragraph (1) and, if applicable, before taking any action with respect to the inquiry of the borrower, the servicer shall--

(A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);

(B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes--

(i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and

(ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or

(C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes--

(i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and

(ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

(3) Protection of credit rating. During the 60-day period beginning on the date of the servicer's receipt from any borrower of a qualified written request relating to a dispute regarding the borrower's payments, a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency (as such term is defined under section 603 of the Fair Reporting Act [15 USC §1681a]).

Judge Magnus-Stinson noted in *Walton v. Chase*[30] that:

> The Seventh Circuit Court of Appeals has read RESPA's definition of a QWR broadly, stating: RESPA does not require any magic language before a servicer must construe a written communication from a borrower as a [QWR] and respond accordingly. The language of the provision is broad and clear….Any reasonably stated written request for account information can be a [QWR]. To the extent that a borrower is able to provide reasons for a belief that the account is in error, the borrower should provide them, but any request for information made with sufficient details enough under RESPA to be a qualified written request and thus to trigger the servicer's obligations to respond.[31]

Whenever a written correspondence reasonably identifies the borrower and the account, and identifies the reasons for the belief the borrower has that the account is in error or what information the borrower is requesting, that request will trigger the servicer's obligation to respond.[32]

The duties that the RESPA imposes on lenders and loan servicers to respond to borrower inquiries are part of what Congress intended to be a remedial consumer protection statute that is to be construed liberally in order to best serve Congress' intent.[33]

**C.**   **A jury could reasonably conclude that Chase violated 12 U.S.C. § 2605(e)(2) where Chase:**

- **Did not provide written response acknowledging receipt of the April 27, 2011 Qualified Written Request ("QWR") within 20 days;**

- **Did not respond appropriately to the January 10, 2011 QWR;**

- **Did not respond appropriately to the April 27, 2011 QWR;**

- **Did not cease its collection efforts and demands by letter and telephone**

---

[30]  *Walton v. Chase Home Fin. LLC*, 2012 U.S. Dist. LEXIS 178439 (S.D. Ind. Dec. 18, 2012) (also holding that Chase violated the RESPA).
[31]  *Catalan v. GMAC Mortgage*, 629 F.3d 676, 687 (7th Cir. 2011).
[32]  12 U.S.C. § 2605(e)(1)(A), (e)(2); *Catalan v. GMAC Mortgage*, 629 F.3d 676, 687 (7th Cir. 2011) (citing *Garcia v. Wachovia Mortgage Corp*., 676 F.Supp.2d 895, 909 (C.D.Cal.2009).
[33]  *Rawlings v. Dovenmuehle Mortgage, Inc*., 64 F. Supp. 2d 1156, 1165 (M.D. Al. 1999).

**collection harassment after receiving the January 10, 2011 QWR from Plaintiffs;**

- **Did not cease its collection efforts and demands by letter and telephone collection harassment after receiving the April 27, 2011 QWR from Plaintiffs;**

- **Did not conduct an appropriate investigation after receiving January 10, 2011 QWR;**

- **Did not conduct an appropriate investigation after receiving April 27, 2011 QWR;**

- **Chase did not correct Plaintiff's account after the January 10, 2011 QWR was received;**

- **Chase did not correct Plaintiffs' account after the April 27, 2011 QWR was received; and**

**Chase violated 12 U.S.C. § 2605(e)(3) where Chase:**

- **Provided information to consumer reporting agencies regarding overdue payments allegedly owed by Homeowners that were related to their Qualified Written Request.**

At 12 U.S.C. § 2605(e)(2) RESPA defines the substance of a servicer's required response. In addition to the twenty (20) day acknowledgment of receipt, the servicer must take one of three actions. Within sixty (60) days after receipt of the Plaintiffs' lawyers' letters, Chase had to:

1.    Correct the account and credit all late charges and penalties and transmit a written notice of correction;

2.    After conducting an investigation, provide a written explanation of why Chase believed the account status to be correct and identify an individual who Plaintiffs' could contact by telephone to discuss the matter (12 U.S.C. §2605 (e)(2)(B)); or

3.    After conducting an investigation, provide all of the information that had been

requested, again with an employee contact (12 U.S.C. §2605(e)(2)(C)).[34]

First, Chase violated 12 U.S.C. § 2605(e)(2) where Chase did not provide written a response acknowledging receipt of the second QWR within 20 days. On or about April 27, 2011, Homeowners sent a second QWR to Chase, again asking Chase to correct their error and to pay damages for Chase's unlawful actions.[35] Chase received the second QWR.[36] Chase never responded to Homeowners' second QWR. This is a violation of RESPA. There is no dispute here. Chase admits it did not respond to the April 27, 2011 letter.[37] This alone is sufficient to deny Chase's Motion For Summary Judgment as to RESPA.

Second, Chase did not respond[38] appropriately to the January 10, 2011 QWR[39]. With respect to Plaintiffs' January 10, 2011 QWR, Chase did not address the request in paragraph 3 of the QWR which states "The status of our loan account at the time of Chase Home Finance's acquisition, i.e.: in default of agreement, current with payments, in repayment plan, etc." It did not provide a written explanation of why account status was not available.[40]

Chase did not respond to paragraph 5 where Plaintiff's asked for the recipient of all fees, expenses associated with the loan. This was important because at the time of sending the QWR and trying to investigate the mistake, the homeowners did not recall receiving the $1,422.00 refund check a two years earlier in March of 2009. Plaintiffs did not discover this until their Attorney Ryan Frasher met with Chase's Attorney Ted Nowacki pre-filing of the suit.

Chase did not respond to paragraph 6 as Chase did not provide the name, address and phone number of the entity that received the $1,422 disbursement from the escrow account in

---

[34] *Johnstone v. Bank of America*, 173 F. Supp. 2d 809, 812 (N.D. Ill. 2001)
[35] Ex. J - Second Qualified Written Request
[36] Ex. H – QWR Acknowledgment Letter From Chase
[37] See [Dkt. 62, p. 9] Chase's Brief In Support of Summary Judgment
[38] Ex. I – Chase's Response To First QWR
[39] Ex. G – January 10, 2011 QWR
[40] 12 U.S.C. § 2605(e)(2), *See also Johnstone v. Bank of America*, 173 F. Supp. 2d 809, 812 (N.D. Ill. 2001)

February 2009. Also, Chase did not provide an explanation of why the information was not available. Chase argues that the attachments to its QWR response were self-explanatory.[41] It was not self-explanatory as it does not state who received the disbursement.   Additionally, Chase would have had this information in early 2011. Why did it not forward the information on February 25, 2011 in its QWR response?

Next, Chase failed to respond appropriately where it did not inform Plaintiffs' why funds were deposited into the suspense account nor did it explain why such information was not available.[42] Chase dedicates a large part of its brief to explaining the $1,422.00. Even if the calculation of the $1,422.00 is correct in its Brief, it still does not lessen liability of RESPA for failing to appropriately respond to the Homeowner's QWR.

The greater issue, which is largely ignored in Chase's Brief, is the $1,399.22 December payment and why it was placed into suspense instead of being applied to the principal. This is the keystone of this entire nightmare.

In November of 2010 the Plaintiffs were instructed to pay $1,399.23 for the December payment because the online website would only accept $1,499.01. It was determined by the Chase representative that $1,499.01 was the incorrect amount and $1,399.23 was the correct amount.[43],[44] Plaintiffs' made the $1,399.23 payment on December 3, 2010 at a local Chase branch pursuant to the instructions of Chase. On January 10, 201 Plaintiffs received eight (8) letters from Chase saying the account was now in default and foreclosure may began.[45] Plaintiffs then reviewed the letters and the online account information. They discovered that instead of processing the December payment of $1,399.23 Chase had put the payment into a suspense

---

[41] See [Dkt. 62, p. 14] Chase's Brief In Support of Summary Judgment
[42] 12 U.S.C. § 2605(e)(2), *See also Johnstone v. Bank of America*, 173 F. Supp. 2d 809, 812 (N.D. Ill. 2001)
[43] *Id*.
[44] Exhibit D – Chase Log

account and coded the account as in default. Consequently, even though Chase had authority to process the Homeowners' next January electronic payment order, Chase's system did not process their January 2011 mortgage payment because it incorrectly coded the Homeowners' Account to be in default. Chase's response to the QWR provided no information as to why Chase put the December payment into a suspense account versus processing the payment as usual. It also did not explain why such information was not available.

Moreover, Chase also failed to correct the error and provide a reverse or provide a credit pursuant to 12 U.S.C. § 2605(e)(2) as the account is still in default.

Lastly, Chase's February 25, 2011 response to the January 10, 2011 QWR did not provide an employee contact pursuant to (12 U.S.C. §2605(e)(2)(C)).

Third, since Chase failed to respond at all to the April 27, 2011 QWR, it failed to appropriately respond to all of the requests in the April 27, 2011 QWR pursuant to 12 U.S.C. § 2605(e)(2).

Fourth, Chase violated RESPA by refusing to cease its collection efforts and foreclosure proceedings after receiving Homeowners' January 10, 2011 QWR pursuant to 12 U.S.C. § 2605(e)(2). From February 2011 through the time the Homeowners' phone number was disconnected, Chase's automated collection robo-call program dialed the Homeowners' phone at least two (2) times per day every day of the week.

Fifth, Chase violated RESPA by refusing to cease its collection efforts and foreclosure proceedings after receiving Homeowners' April 17, 2011 QWR pursuant to 12 U.S.C. § 2605(e)(2). From February 2011 through the time the Homeowners' phone number was disconnected, Chase's automated collection robo-call program dialed the Homeowners' phone at least two (2) times per day every day of the week.

---

[45] Exhibit F – Account Delinquent and ACH Cancellation

Sixth, Chase did not conduct an appropriate investigation after receiving the January 10, 2011 QWR as it did not address why the $1,399.23 was put into a suspense account or explain why the account was correct.[46,47]

Seventh, Chase did not conduct an appropriate investigation after receiving the April 17, 2011 QWR as it did not address why the $1,399.23 was put into a suspense account or explain why the account was correct as Chase provided no response to the QWR at all.

Eight, Chase did not correct Plaintiffs' account after the January 20, 2011 QWR was received as the Plaintiffs' account is still in default.

Ninth, Chase did not correct Plaintiffs' account after the April 27, 2011 QWR was received as the Plaintiffs' account is still in default.

Tenth, Chase reported to credit reporting agencies that the Plaintiffs were overdue and delinquent, in violation of U.S.C. §2605(e)(3). At 12 U.S.C. § 2605(e)(3), RESPA prohibits a lender from reporting any derogatory payment history to any credit reporting agency until it has responded to the Plaintiffs' written inquiries in the manner required by RESPA.  Specifically, the statute reads:

(3) Protection of credit rating. During the 60-day period beginning on the date of the servicer's receipt from any borrower of a qualified written request relating to a dispute regarding the borrower's payments, a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency (as such term is defined under section 603 of

---

[46] Ex. I - Chase's February 25, 2011 Response Letter
[47] *Hittle v. Residential Funding Corp.*, 2014 U.S. Dist. LEXIS 107423, 30-31 (S.D. Ohio Aug. 5, 2014) (discussing when servicer must explain why the account is correct); s*ee also Kesten v. Ocwen Loan Servicing, LLC* 2012 WL 426933 (N.D. Ill. Feb. 9, 2012) ("perfunctory response" which did not contain an explanation or clarification as to why the borrowers' request for an interest overcharge refund could not be processed was not a sufficient statement of reasons for servicer's actions).

the Fair Reporting Act [15 USC §1681a]).[48] Perfunctory

Despite this prohibition, Chase made derogatory payment reports as to the Plaintiffs during the sixty business day period following its receipt of Plaintiffs' January 10, 2011 and April 27, 2011 QWRs. In January 2011 Ms. Jackson had available credit with Bank of America in the amount of $20,258.00 and $18,208 on her Citibank credit card. By May of 2011 her available credit was reduced to $0.00 for a net loss of $38,466 in available credit. RESPA was violated with each derogatory reporting, and liability attaches as to each.

Each of Chase's ten RESPA violations is independently remediable by 12 U.S.C. §2605(f). Because § 2605(e) is to be construed liberally to in order to best serve Congress' intent, even unintentional acts that result in noncompliance violate § 2605(e)(2).[49]

## D. A jury could reasonably conclude that Chase has a pattern or practice of violating 12 U.S.C. § 2605(e).

Plaintiffs are entitled to statutory damages where Chase has a pattern or practice of noncompliance.[50] Chase should be held liable for each violation of RESPA. As the *Rawlings* court noted, "[t]he relevant damages section provides that 'whoever fails to comply with any provision of this section shall be liable to the borrower for *each* such failure….'  12 U.S.C. § 2605(f)"[51]

Plaintiffs submit pattern or practice evidence to support their statutory damages claim as follows:

---

[48] *Johnstone v. Bank of America*, 173 F. Supp. 2d at 813; *Ploog v. Homeside Lending, Inc.*, 209 F. Supp. 2d at 868.
[49] *Rawlings v. Dovenmuehle Mortgage, Inc.*, 64 F. Supp. at 1163.
[50] 12 U.S.C. § 2605(f)
[51] *Rawlings v. Dovenmuehle Mortgage, Inc.*, 64 F. Supp. 2d at 1161.

First, by reference, Plaintiffs incorporate the ten RESPA violations cited in section C of their memorandum in support of summary judgment.[52] In *Wright*, the Court ruled held that the loan servicer exhibited a pattern or practice of noncompliance with RESPA based on the numerous violations established by the evidence.[53] The Plaintiffs in *Wright* had forwarded three written communications to the loan servicer and had numerous telephone communications disputing the account.[54] In *Moore*, Plaintiffs did not show a pattern or practice of noncompliance where two written communications where forwarded and no other evidence of violations where submitted.[55]

Here, Plaintiffs forwarded two QWRs, had numerous phone disputes[56] and submit evidence of ten violations of RESPA in their memorandum in support of summary judgment.[57] Like in *Wright*, Plaintiffs have demonstrated a pattern or practice of Chase's noncompliance with RESPA. Lastly, the Plaintiffs attempted to obtain the address to send a third QWR but Chase could not provide a definitive answer on where to send a third QWR.[58]

Second, Chase has a pattern or practice of noncompliance with RESPA against other consumers. In *Walton*, the Plaintiff was having similar issues with Chase's escrow analysis of the account.[59] The Plaintiff sent Chase three QWRs attempting to correct the problem and request information. The Court held that Chase violated § 2605(e) of RESPA by failing to appropriately respond to the QWRs.

---

[52] Dkt. 60 – Plaintiff's Motion For Summary Judgment
[53] *Wright v. Litton Loan Servicing LP*, 2006 U.S. Dist. LEXIS 15691 (E.D. Pa. Apr. 4, 2006)
[54] *Id.*
[55] *Moore v. Mortgage Elec. Registration Sys., 2013 DNH 65 (D.N.H. 2013)*
[56] One such conversation was recorded and transcribed, *See generally* Exhibit I – Transcript of October 25, 2011 telephone conversation. *See also* [Dkt. 41] First Amended Complaint ¶23-24 and 39-49 discussing three phone calls and disputes.
[57] Dkt. 60 – Plaintiff's Motion For Summary Judgment
[58] Ex. M – Transcript of Conversation with Chase, bates 230-234
[59] *Walton v. Chase Home Fin. LLC*, 2012 U.S. Dist. LEXIS 178439 (S.D. Ind. Dec. 18, 2012)

Third, in *Baginski* made similar allegations against Chase as the Plaintiffs here. *Baginski* alleged that Chase failed to apply to his monthly payments correctly, then contacted a credit bureau concerning the missed payments and then Chase stopped accepting payments from him.[60] This is very similar to the allegations of Plaintiff.

Fourth, according to the Consent Order of April 13th, 2011 Chase was among the largest servicers of residential mortgages with a portfolio of 6,300,000 loans.[61] The Consent Order held that Chase engaged un unsafe and unsound banking practices where it failed to devote sufficient financial, staffing and managerial resources to ensure proper administration of its foreclosure processes; failed to devote to its foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training; and failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services.[62]

Plaintiffs have submitted sufficient pattern or practice of noncompliance with RESPA. Chase should be held liable for each violation of RESPA. As the *Rawlings* court noted, 'The relevant damages section provides that 'whoever fails to comply with any provision of this section shall be liable to the borrower for *each* such failure….'  12 U.S.C. § 2605(f)"[63]

**E.**      **A jury could reasonably conclude that the Homeowners incurred actual damages.**

Plaintiffs have suffered actual damages due do Chase's failure to comply with its duties under RESPA. The Plaintiff must provide sufficient support for an award of actual damages under *Catalan* in order to be entitled to actual damages.[64] Here, Plaintiffs have pleaded that

---

[60]*Baginski v. JP Morgan Chase Bank N.A.*, 2012 U.S. Dist. LEXIS 169754 (N.D. Ill. Nov. 29, 2012)
[61] Page 2, ¶1 at http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47e.pdf (visited on September 16, 2014)
[62] *Id*. at Page 2 & 3.
[63] *Rawlings v. Dovenmuehle Mortgage, Inc*., 64 F. Supp. 2d at 1161.
[64] *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 693 (7th Cir. Ill. 2011) ("Plaintiffs must come forward with evidence sufficient to support an award of actual damages to pursue their RESPA…claims.")

actual damages are to be determined at trial and have requested a trial by jury to determine such amount.[65] Thus, Plaintiffs request the Court address whether Plaintiffs suffered any actual damages but leave the what and the amount of actual damages for the trier of fact.[66]

Actual damages can be demonstrated by the denial of access to the full amount of credit line.[67] In January 2011 Ms. Jackson had available credit with Bank of America in the amount of $20,258 and $18,208 with her Citibank credit card. By May of 2011 her available credit was reduced to $0.00 for a net loss of $38,466 in available credit. No other events other than Chase's negative reporting that the mortgage was default could have contributed to the credit reduction. This is sufficient to support an award of $38,466 in actual damages.

Actual damages can be demonstrated by pecuniary loss from time spent away from employment, expenses and/or certified copies of correspondence.[68] Jackson's hourly billable rate as an attorney in 2010 and 2011 was $300 per hour. Jackson spent 10.7 hours attempting to see how Chase made the mistake and drafting the two QWRs. This was time away from her law practice. Jackson's opportunity costs and drafting the QWRs totaled at least $3,210 in actual damages. This is sufficient to support an award of $3,210 in actual damages.

Jackson also submits to the Court that her employment with based on information and belief, Jackson's employment applications with the Consumer Financial Protection Bureau and the Federal Reserve Board were adversely affected by Chase's negative credit reporting.

Mr. Perron also had time away from employment. He worked as an investigator on legal mortgage cases for attorneys reviewing account histories at the rate of $100 per hour.  He

---

[65] [Dkt. 41] First Amended Complaint between ¶74 and ¶75.

[66] The damages discovery cutoff date does not expire until November 14, 2014.

[67] *Cortez v. Keystone Bank, Inc*., 2000 U.S. Dist. LEXIS 5705 (E.D. Pa. May 2, 2000) (denial of access to the full amount of the credit line resulted from an improper failure to correct the assessment of interest charges, this would constitute actual damages for which Keystone could be liable.)

estimates he spent 9 hours trying to see how Chase made the mistakes on the account and reviewing the QWR. Perron's time away from employment for analyzing documents and reviewing the QWRs totaled at least $900 in actual damages. This is sufficient to support an award of $900 in actual damages.

Plaintiffs also paid $5.54 in postage for the first QWR and $5.75 for the second QWR.[69] This is sufficient to support an award of $11.29 in actual damages.

In late 2013, Chase made a demand to Plaintiffs. As a result of such demand, Perron worried that while he was on extended vacation to Mexico, Chase would foreclosure and would enter the home and remove his possessions. Perron, through Jackson's law practice, has seen banks do this to consumers where the house appears to be unoccupied. Thus, starting in January 2014 Perron rented a storage unit to contain the majority of his belongings.  In 2014 he has paid a total of $2,032.60.[70] This is sufficient to support an award of $2,032.60 in actual damages.

A jury could reasonably conclude that the Homeowners suffered emotional distress damages. Emotional distress damages are available as actual damages under RESPA.[71] Chase argues in its Brief that Plaintiffs failed to plead emotional distress damages in their Amended Complaint.[72] This is not accurate. In paragraph 74 of the Amended Complaint, Plaintiff's stated "Homeowners suffered actual damages, including but not limited to, mental anguish, medical costs, postage costs, transportation costs, photocopying costs, credit damage,

---

[68] *Id.* (actual damages encompass compensation for any pecuniary loss including such things as time spent away from employment while preparing correspondence to the loan servicer, and expenses for preparing, photocopying and obtaining certified copies of correspondence.)

[69] *McMillen v. Resurgent Capital Servs., L.P.,* 2014 U.S. Dist. LEXIS 92345, 6-7 (S.D. Ohio July 8, 2014) ("where the borrower incurs costs as the result of submitting a QWR but effectively receives no benefit, due to a servicer's non-trivial violation of 12 U.S.C. § 2605(e)(2), those costs may become "actual damages" under 12 U.S.C. § 2605(f)(1)(A).")

[70] Ex. K – Storage Rental Statement

[71] *Catalan v. GMAC Mortg. Corp.,* 629 F.3d 676, 696 (7th Cir. Ill. 2011) ("GMAC Mortgage concedes that emotional distress damages are available as actual damages under RESPA, at least as a matter of law...")

[72] See [Dkt. 62, p. 17] Chase's Brief In Support of Summary Judgment

loss of access to credit, loss of work production, loss of potential employment and loss of marital relationship as a result of CHASE's violation of RESPA."[73] Second, in Plaintiffs' Initial Disclosures, "Plaintiffs seek recovery of statutory, actual punitive and emotional distress damages and reasonable attorneys' fees in an amount to be determined."[74] Third, by pleading for actual damages, Plaintiff may seek emotional distress damages.[75] Chase was on sufficient notice that Plaintiffs were seeking emotional distress damages and what emotional distress damages revolved around.

Here, emotional distress damages are supported where Jackson believed that Chase would or could appropriately apply the correct mortgage payment to correct the account in December 2010 as agreed to by Jackson and Chase. Causation of emotional distress damages may be supported by lay testimony.[76] In January 2011 Plaintiff found out that Chase put the December 2010 payment into a suspense account instead of processing it correctly. Perron was furious at Jackson for believing that based on her conversation with the Chase representative that Chase would or could apply the payment correctly. Perron's cynicism toward Chase came from his and Jackson's work on other RESPA cases involving loan servicers such as Chase. Perron's anger and blame toward Jackson precipitated into many arguments over the next year. Also, the reduction of Jackson's credit line meant Jackson could not afford to keep her practice afloat. This elevated tensions ever more so as Jackson's financial troubles were imminent without her credit line to run the business. Because of stress in the household at this time, Perron filed for Divorce in March of 2012. They were married for 25 years at that time. But for Chase's mistake and

---

[73] *See* Dkt. 41, ¶74 – First Amended Complaint
[74] Ex. O – Plaintiff's Initial Disclosures
[75] *Id.*
[76] *McLean v. GMAC Mortg. Corp., 595 F. Supp. 2d 1360, 1370* (S.D. Fla. 2009) (plaintiffs may establish causation through lay testimony on their emotional distress damages under RESPA.)

turmoil it caused Plaintiffs, Plaintiffs would still be married. Plaintiffs' respective loss of marriage is sufficient to support an award of emotional distress damages at trial.[77]

Jackson has had a significant reduction in her production at work due to loss of concentration, crohn's flair up due to stress, medical leave and depression.[78]   At one point Jackson sought the assistance of the Judges Lawyers Assistance Program ("JLAP") because of the stress of Chase's error had caused and the stress of her declining financial situation where her credit line was reduced by $38,466. JLAP recommended that Jackson close her practice before the stress she was under caused her to make a mistake. JLAP referred her to counselor Lois Bushong of Quiet Streams Counseling at 14074 Trade Center Drive, Ste. 225, Fishers, IN 46038. Counselor Bushong recommended that Jackson close her law practice because of Jackson's health.

Jackson was also seen before and after Chase's mistake by Kimberly R. Gatzimos, M.D. at 1650 W. Oak Street, Zionsville, IN 46077. Dr. Gatzimos put her on four months of medical leave in 2012 because of her medical condition which was triggered by the stress caused by Chase's mistake. Eventually Dr. Gatzimos recommended that Jackson close her practice due to Jackson's health.

Jackson closed her limited liability corporation on July 1, 2013 based on the recommendation of JLAP, Counsel Bushong and Dr. Gatzimos. In 2012 Jackson estimates her lost income at $75, 600 due to Chase's mistake. In 2013 she estimates her lost income also to be at $75,600. This totals $151,200 in actual damages.

Chase also force placed a lesser insurance policy and Perron incurred a $7,500 shortfall. In the spring of 2013 a hail storm damaged the Perron's house at 1235 E. 106th St, Indianapolis,

---

[77] *Id.*
[78] *Id.*

IN 46280-1461. Eagle Adjusting Services, Inc provided an estimate of repairs.[79] The estimate was for $12,286. Perron received an insurance check for about $4,500. This was a shortfall of $7,500. This totals $7,500 in actual damages.

Also the premium was higher for the force placed insurance at $2,257 where previous years the premium was only $838.00. The difference constitutes actual damages in the amount of about $1419.00 per year.

In total, Plaintiffs have submitted evidence to support over $240,000 in actual damages. This figure does not include the value of the Plaintiffs marriage before divorce or Jackson's projected loss income at her loss of income from her law practice.

**E.    A jury could reasonably conclude that Chase breached its duty of good faith and fair dealing where it did not apply the December $1,399.23 payment toward the principal and instead put the payment into a suspense account.**

A breach of good faith and fair dealing is essentially a breach of fiduciary duty.[80] A servicer that collects escrow payments from a homeowner owes a fiduciary duty to the homeowner.[81] The Homeowners have a first mortgage on their personal residence which was serviced by Chase Home Financing LLC ("Chase") during 2008 through present.[82] 21.    Chase told Homeowners that it would code their account to accept a payment in the amount of $1,399.23 for December 2010 and instructed Homeowners to make their December payment at a local Chase branch.  Chase also stated that the new automatic monthly electronic bank transfer from the new bank account would be effective January 2011, in the amount of $1,399.23.[83]

---

[79] Ex. L – Estimate For Hail Damage
[80] *Del Vecchio v. Conseco, Inc.*, 788 N.E.2d 446, 451 (Ind. Ct. App. 2003)
[81] *Heller v. First Town Mortg. Corp.*, 1998 U.S. Dist. LEXIS 14427 (S.D.N.Y. Sept. 11,1998)
[82] [Dkt. 42] Answer, ¶ 7
[83] Affidavit of Jackson, ¶ 3; *see also* Ex. D – Chase Call Log Page, bates 000064

Homeowners discovered that Chase did not apply the Homeowners' December 2010 payment towards their December monthly payment obligation.[84] Instead, Chase put Homeowners' December 2010 payment, in the amount of $1,399.23, into a "suspense" account. Chase then coded the Homeowners' Account as being in default.[85] A jury could reasonably conclude that Chase breached its duty of good faith and fair dealing.

### V
### CONCLUSION

Plaintiffs request that the Court deny Defendant Chase's Motion for Summary Judgment.

Dated: October 31, 2014                    Respectfully submitted,

                                   s/ Ryan R. Frasher
                                  Ryan R. Frasher
                                  The Frasher Law Firm, P.C.
                                  155 East Market Street, Ste 450
                                  Indianapolis, IN 46204
                                  317-634-5544
                                  317-630-4824 (fax)
                                  rfrasher@frasherlaw.com

                                  **ATTORNEY FOR PLAINTIFF**

### CERTIFICATE OF SERVICE

I hereby certify that on or about October 31, 2014, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic system, or mail where necessary. Parties may access this filing through the Court's system.

Brian S. Jones
b.jones@boselaw.com

---

[84] Affidavit of Perron, ¶ 15
[85] Affidavit of Jackson, ¶ 6

David J. Jurkiewicz
djurkiewicz@boselaw.com

Joel T. Nagle
jnagle@boselaw.com

                                      s/ Ryan R. Frasher

The Frasher Law Firm, P.C.
450 Barrister Building
155 East Market Street
Indianapolis, Indiana  46204
Office: (317) 634-5544
Fax: (317) 630-4824