**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| STEPHEN H. PERRON,<br>CHRISTINE M. JACKSON,<br>UNITED STATES BANKRUPTCY TRUSTEE OF THE SOUTHERN DISTRICT OF INDIANA,<br><br>Plaintiffs,<br><br>vs.<br><br>JP MORGAN CHASE BANK, N.A. Formally known as Chase Home Finances, LLC,<br><br>Defendant. | ) | Case No. 1:12-cv-01853-TWP-TAB |

**ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Partial Summary Judgment filed by Plaintiffs Stephen H. Perron ("Mr. Perron") and the United States Bankruptcy Trustee, Southern District of Indiana, on behalf of Christine M. Jackson ("Ms. Jackson") (Filing No. 59). On January 1, 2013, Ms. Jackson filed for Chapter 7 Bankruptcy protection under Case No. 13-00743-JKC-7A. Her claims are now being pursued by the United States Bankruptcy Trustee, Southern District of Indiana. Before the Court also, is a Motion for Summary Judgment filed by Defendant JP Morgan Chase Bank, N.A. ("Chase") (Filing No. 61). Plaintiffs' Amended Complaint asserts claims against Chase for alleged violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et. seq.*, and for breach of good faith and fair dealing. For the reasons set forth below, Plaintiffs' motion for partial summary judgment is **DENIED**, and Chase's motion for summary judgment is **GRANTED**.

## I. BACKGROUND

The following material facts are not in dispute and will be viewed in light most favorable to the non-moving party as it relates to each motion.[1] On or about May 2, 2003, Mr. Perron and Ms. Jackson (collectively, the "Borrowers"), as a married couple, executed and delivered a promissory note ("Note") and mortgage ("Mortgage") on their personal residence in Indianapolis, Indiana. Chase began servicing the Note and Mortgage in 2005. As servicer, Chase agreed to disburse escrow funds to pay Borrowers' annual homeowners' insurance premium. On or about February 17, 2009, Chase forwarded payment to the Borrowers' then current insurance provider, Allstate, for the insurance premium from the Borrowers' escrow account in the amount of $1,422.00. Sometime in early March 2009, the Borrowers canceled their Allstate policy and obtained homeowners' insurance through Homesite Insurance ("Homesite"). A few week after mailing the insurance payment to Allstate, Chase discovered that Borrowers had terminated their Allstate policy in exchange for a new homeowner policy with Homesite. On or about March 4, 2009, Chase forwarded payment to Homesite for homeowners' insurance premiums from the Borrowers' escrow account in the amount of $838.00. In a letter dated March 5, 2009, Chase notified the Borrowers that two homeowners' insurance premiums had been paid due to the change in providers and any refund received by Chase from the canceled policy would be deposited into the Borrowers' escrow account. The letter further explained that if the premium refund was sent to the Borrowers, it should be remitted to Chase so that the funds could be applied to their escrow account to prevent an escrow shortage. The letter also notified Borrowers that if Chase did not

[1] Plaintiffs did not provide a statement of material facts in dispute in their response to Chase's motion for summary judgment, as required by S.D. Ind. Local Rule 56-1(b). ("The response *must* include a section labeled 'Statement of Material Facts in Dispute' that identifies potentially determinate facts and factual disputes . . . .") (emphasis added). Under Federal Rule of Civil Procedure 56(e), where a party fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2).

receive the refund in its office by the time of their next escrow analysis, the monthly mortgage payment amount would increase accordingly, and also provided an address to which to mail the refunded premium amount to Chase. (Filing No. 63-3). Unbeknownst to Chase, Allstate had already sent Borrowers a refund check dated March 2, 2009, for the entire $1,422.00. Despite Chase's request in the March 5, 2009 letter, Borrowers did not send Chase the refund to replenish the escrow account, did not inform Chase of receipt of the insurance premium refund, and instead deposited the $1,422.00 refund from Allstate into their National City Bank account on April 28, 2009.

On or about December 28, 2009, Chase sent Borrowers their Annual Escrow Disclosure Statement (the "2009 Escrow Analysis"). The 2009 Escrow Analysis reflected both the $1,422.00 and the $838.00 insurance premiums paid in 2009, but only projected to pay an $838.00 homeowners' insurance premium in 2010. Because the $1,422.00 refund paid to Borrowers from Allstate was not returned to Chase to be deposited back into their escrow account, the 2009 Escrow Analysis required an escrow shortage payment totaling $802.28 to be included with Borrowers' payments effective February 1, 2010 to prevent the escrow account from dropping below the reserve amount required by law. Borrowers were given the option to pay this amount in one lump sum in December 2009, or to have it spread out over their 2010 monthly mortgage payments. Because Borrowers did not pay the escrow shortage amount in a single lump sum, the escrow shortage amount was spread into monthly installments of $66.86, making the monthly mortgage payment required for 2010 $1,499.01. If the Borrowers had paid the shortage amount in one lump sum of $802.28, their monthly mortgage payments for 2010, including principal, interest, taxes and insurance would have been $1,432.15. Even though the 2009 Escrow Analysis stated that Borrowers' monthly mortgage payment for 2010 was $1,499.01, Borrowers only tendered

$1,469.20 for the period of February 2010 through November 2010, thus underpaying their mortgage by $29.81 each month.

On or about December 27, 2010, Chase sent Borrowers their Annual Escrow Account Disclosure Statement ("2010 Escrow Analysis"). The 2010 Escrow Analysis reflected that in 2010, Chase paid one homeowners' insurance premium in the amount of $861.00, not the two insurance premiums as Borrowers assumed. The 2010 Escrow Analysis also reflected that the county taxes on the real estate were less than anticipated, and Chase was only required to pay $1,306.94 for county tax despite projecting $1,724.96 as the amount that would be payable for county taxes in 2010. As a result of the reduction in the county tax, and the Borrowers' February 2010 through November 2010 payments, the 2010 Escrow Analysis reflected a surplus in the escrow account of $250.05 and a projected monthly payment starting in February 2011 of $1,399.23. On December 28, 2010, Borrowers received a check from Chase in the amount of $250.05, representing the amount of their 2010 escrow surplus.

On or about December 3, 2010, as Borrowers attempted to modify their automatic electronic bank transfer settings, they discovered that the amount of their 2010 scheduled mortgage payments was $1,499.01, and the monthly mortgage payments for 2011 were scheduled to be $1,399.23. Based upon the belief that the discrepancy in their monthly payment amount was due to the double payments made to the Borrowers' previous and current homeowners' insurance carriers, they called Chase customer service and made arrangements with a representative to make a payment of $1,399.23 toward their December 2010 mortgage payment directly at a Chase branch, because the online payment system would not accept an amount less than the $1,499.01, the monthly payment amount for 2010. However, this payment was not applied toward the Borrowers' mortgage, but instead was held in a "suspense account" and Chase coded their account as being in

default. On or about January 10, 2011, Borrowers received eight form letters from Chase notifying them that their mortgage account was in default and that Chase intended to institute foreclosure proceedings. After receiving these letters is when Borrowers discovered that their December 2010 payment had been placed into a suspense account and had not been credited toward their December 2010 payment obligation. Borrowers did not make any additional payments on their mortgage in January 2011 or any time thereafter.

Borrowers sent Chase a letter they entitled a Qualified Written Request Letter ("QWR") on January 10, 2011, which accused Chase of improperly taking $1,422.00 from their escrow account in February 2009 and demanded Chase return the $1,422.00 taken from the escrow account, re-credit the account for all improper default fees, and report the account as current to the credit bureaus. Borrowers did not recall that they had received the March 9, 2009 letter from Chase explaining the double insurance premium disbursement due to the change in insurance providers, nor did they recall receiving and depositing the check from Allstate in March 2009. On January 27, 2011, Chase sent Borrowers correspondence acknowledging the receipt of the QWR and informing them that Chase was investigating the issues contained therein. On February 25, 2011, Chase sent Borrowers a letter in response to their QWR, which included Borrowers' loan history and Annual Escrow Account Disclosure Statements from 2007 through 2010, containing a line-item explanation of the double insurance premiums paid in 2009 and the resulting escrow shortage in 2010. Borrowers sent another letter to Chase on April 27, 2011, entitled second QWR, requesting the same information provided to them in the February 25, 2011 response from Chase, as well as demanding payment in the amount of $330,000.00 for alleged damages. Chase did not respond to this second QWR letter.

Borrowers began receiving phone calls from Chase's collection department on or about January 28, 2011. When Mr. Perron answered the phone and heard that the call was from Chase, he hung up the phone. From February 2011 through the time the Borrowers' phone number was disconnected, Chase's collection department automatically dialed the Borrowers' phone at least two times per day. Most of the time, Borrowers did not answer the phone. Ms. Jackson spoke with a Chase representative on February 24, 2011, who attempted to convince Ms. Jackson to make at least one mortgage payment to keep the account from foreclosure. Ms. Jackson refused to make any additional payments because she believed their account was in error. Mr. Perron filed for divorce in March 2012, and Ms. Jackson closed her law practice on July 2, 2013. Borrowers allege that the stress resulting in their divorce and damage to their credit history were due to Chase's errors in servicing their mortgage account and failure to properly respond to their QWR.

## II. LEGAL STANDARD

Summary judgment is only appropriate by the terms of Rule 56 where there exists "no genuine issue as to any material facts and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. This notion applies equally where, as here, opposing parties each move for summary judgment in their favor pursuant to Rule 56. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir. 1996). Indeed, the existence of cross-motions for summary judgment does not necessarily mean that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., Inc. v. Int'l Union of Operating Eng'rs.*, 335 F.3d 643, 647 (7th Cir. 2003). Rather, the process of taking the facts in the light most favorable to the nonmovant, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id*. at 648. "With cross-motions, [the Court's] review of the record requires that [the Court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration*

*Forums, Ins*., 246 F.3d 975, 983 (7th Cir. 2001) (quoting *Hendricks–Robinson v. Excel Corp*., 154 F.3d 685, 692 (7th Cir. 1998)).

## III. ANALYSIS

Borrowers allege that Chase breached its duty of good faith and fair dealing in the mishandling of their escrow account, and that it violated RESPA on ten separate occasions in its failure to properly respond to their correspondence. Borrowers claim that these violations were the proximate cause of damages they sustained, including the end of their marriage, loss of credit, physical and emotional distress, loss of Ms. Jackson's law practice, as well as statutory damages for engaging in a "pattern or practice" of RESPA violations.

### A. Breach of Good Faith and Fair Dealing

Borrowers make factual claims in support of their breach of good faith and fair dealing claims that they either fail to support with objective evidence and/or which are contradicted by undisputed evidence. Borrowers claim that the escrow "shortage" of $802.28 as of December 31, 2009, was caused by the incorrect projections for the 2010 insurance premium amount, and that Chase's automated annual escrow analysis program calculated the 2010 insurance obligation based upon the sum of the premiums paid to Allstate and Homesite in 2009, which was $2,260.00. Borrowers argue that this improper handling of their escrow account constituted a breach of good faith and fair dealing. However, they have provided no evidence to support their theory that the inclusion of two amounts for homeowners' insurance for 2010 was the cause of the payment discrepancies.

As was explained in the March 5, 2009 letter from Chase to Borrowers, as well as the 2009 Escrow Analysis, the escrow shortage was caused by Borrowers' failure to send the refund of the Allstate policy premium to Chase in order to replenish the escrow account. As a result, the $213.58

monthly escrow payments originally scheduled for 2010 would have been insufficient to keep the escrow account above the required minimum, and would have resulted in a funding deficit of $375.12 by April 2010. The $375.12 projected deficit, plus the $427.16 required reserve, equaled the $802.28 escrow shortage amount. (Filing No. 65-6). The 2009 Escrow Analysis compared the 2009 projections versus the actual payments made by Borrowers, including the two entries for "Homeowner In[surance]." (Filing No. 65-6, at ECF p. 2). The 2009 Escrow Analysis also gave Borrowers the option to pay the escrow shortage in one lump sum, and included a payment coupon for $802.26. (*Id.*) In the "Computation of Your Escrow Account" section of the statement, Chase notified Borrowers of their anticipated escrow balance, the target escrow balance, and the resulting shortage "that will be collected over a period of 12 months or more" if they chose not to make a lump-sum payment using the attached payment coupon. (Filing No. 65-6, at ECF p. 3). It also explicitly stated "[y]our new monthly mortgage payment for the coming year will be $1,499.01 of which $1,218.57 will be for principal and interest and $280.44 will go into your escrow account." (*Id.*) Borrowers provide no support for any other alternative reason or calculation for the discrepancy between what they believed their payments should have been versus the amount stated in their 2009 and 2010 Escrow Analyses, besides their unsupported affidavits based upon "information and belief." Because Borrowers do not dispute Chase's factual assertions in their response to Chase's brief in support of summary judgment, the Court may accept Chase's factual explanation as undisputed, and finds that no reasonable jury could conclude that Chase caused an error in the borrowers' escrow account calculations, or that any discrepancies were caused by Chase, not Borrowers.

Borrowers have not shown that Chase made any error in the computation of their monthly mortgage payments, the escrow calculations or disbursements, or in the servicing of their loan.

Based upon the undisputed evidence presented by Chase, Borrowers had been informed in March 2009 that their failure to remit the Allstate insurance premium refund to Chase could result in a potential escrow shortage, and that their payment amount would increase accordingly. (Filing No. 65-1, at ECF p. 2). The evidence shows that by the time Borrowers' account was declared to be in default, they had been underpaying the amount due on their Mortgage each month, based upon the 2009 Escrow Analysis, for almost an entire year.

Borrowers have also not presented any evidence, aside from their own unsupported assertions, that Chase wrongfully placed their December 2010 payment in a suspense account instead of applying it to their December payment obligation. Borrowers argue that they were verbally authorized by a Chase phone representative to make a payment of only $1,399.23 for December 2010 at a Chase branch, instead of the $1,499.01 payment scheduled to be made for December 2010. At best, this is an oral modification of the mortgage agreement, which is not enforceable under Indiana law. I.C. § 26-2-9-4(b)(1) ("A debtor may assert a claim or defense . . . only if the credit agreement at issue . . . is in writing."); *see also Collins v. America's Servicing Co.*, 652 F.3d 711, 715 (7th Cir. 2011) ("[Debtor] cannot make a breach of contract claim based on alleged oral modifications to loan agreements.") (citing I.C. § 26-2-9-4(b)). The undisputed evidence also shows that the agreement to accept $1,399.23 for December 2010 was based upon incorrect information supplied by Borrowers to the Chase representative, not because of a mistake made by Chase.

The Court concludes that there exists no reasonable basis upon which a jury could conclude that Chase breached its duty of good faith and fair dealing either in the calculation of Borrowers' monthly mortgage payments, nor in the placement of the Borrowers' December 2010 payment into

a suspense account. Therefore, Chase's motion for summary judgment on Borrowers' breach of good faith and fair dealing claim is **GRANTED**.

**B. RESPA Claims**

Congress enacted RESPA to regulate the real estate settlement process, including servicing of loans and assignment of those loans. *See* 12 U.S.C. § 2601. RESPA imposes a number of duties on lenders and loan servicers. Most relevant here is the requirement that loan servicers respond promptly to borrowers' written requests for information, § 2605(e). RESPA establishes the requirement for how a mortgage loan servicer or lender must conduct its post-closing servicing of the loan, and § 2605(e) specifically sets forth the duties and statutory obligations of a loan servicer or lender in receiving and responding to borrowers' written inquiries. Under RESPA, a Qualified Written Request ("QWR") is a written correspondence that includes the borrower's name and account number, and a statement of the reasons for the belief of the borrower that the account is in error. 12 U.S.C. §2605(e). Under § 2605(e), the loan servicer must provide a written response acknowledging receipt of the correspondence within twenty days, and then within sixty days must either (1) make appropriate corrections in the borrower's account and send a written notification of such correction; (2) after conducting an investigation, provide the borrower with a written explanation or clarification that includes a statement of the reasons why the servicer believes the account is correct, as well as the name and telephone number of an individual or department who can provide assistance to the borrower; or (3) after conducting an investigation, provide the borrower with a written explanation that includes information requested by the borrower, or an explanation of why the information is unavailable, and the contact information of an individual or department at the servicer who can provide assistance to the borrower. Here, Borrowers allege

that Chase violated RESPA on ten separate occasions, and that they have demonstrated a "pattern and practice" of RESPA violations by Chase.

Borrowers have not shown that there is a dispute of material fact as to whether Chase violated RESPA in its response to their correspondence. Borrowers allege that Chase did not research or respond "appropriately" to their January 10, 2011 QWR, and did not correct their account after the January 2011 QWR was received by Chase. However, the undisputed evidence shows that Chase responded to the Borrowers' inquiry by sending both an acknowledgement that the inquiry had been received (Filing No. 60-8), as well as copies of the loan history and escrow statements from 2007 through 2010. (Filing No. 60-9). Under RESPA, Chase was only required to respond to inquiries regarding the servicing of the loan, as a QWR is correspondence that "includes a statement of the reasons for the belief of the borrower . . . that the account is in error." 12 U.S.C. § 2605(e)(1)(B)(ii). Any additional requests for action or information does not fall within the definition of a "Qualified Written Request," and therefore a failure of Chase to provide such information or requested remedy would not constitute a violation of RESPA. *See MorEquity Inc. v. Naeem*, 118 F. Supp. 2d 885, 901 (N.D. Ill. 2000) (dismissing RESPA counterclaim because the purported QWR sought information related to the validity of the loan but unrelated to the servicing); *Moore v. F.D.I.C.*, 2009 WL 4405538 at*4 (N.D. Ill. Nov. 30, 2009) ("Because requests for information related to the status of a defaulted mortgage loan and delinquent mortgage payments do not relate to the receipt of a scheduled periodic payment or information regarding the servicer making any payments with funds received from the borrow, such requests do not constitute 'servicing.'")

Borrowers have not presented any evidence that the response provided by Chase did not satisfy its obligation under 12 U.S.C. § 2605(e)(2)(B), which was to provide "a statement of the

reasons for which the servicer believes the account of the borrower is correct as determined by the servicer[.]" Chase provided a detailed record of each payment received and each disbursement made from the escrow account from 2007 to 2011, showing the reason why it believed there was no error in the Borrowers' account. Chase was not required to make a correction to the Borrowers' account under 12 U.S.C. § 2605(e)(2)(A) because there was no correction to be made. The fact that the Borrowers forgot they had received a refund of their Allstate homeowners' insurance premium in 2009, and thus did not understand the explanation provided by Chase until their attorney met with Chase's attorney prior to filing this action, does not render Chase's investigation or response inadequate under RESPA. *See Bates v. JPMorgan Chase Bank, NA*, 768 F.3d 1126, 1135 (11th Cir. 2014) (no RESPA violation where borrower was merely "confused and/or unsatisfied" with the answer from the servicer where servicer provided written explanation for its belief that borrower's account was correct).

Because the April 27, 2011 correspondence from Borrowers to Chase was, in all material respects, a duplicate of the January 10, 2011 QWR that did not seek any additional information as it related to the servicing of the loan, Chase had already satisfied its obligation under RESPA to provide this information. Importantly, Borrowers have not shown that there was any basis for Chase to make any corrections to their account or provide them compensation for damages arising from Chase's alleged "improper handling" of Borrowers' QWR. Thus, the Court concludes there was no RESPA violation in Chase's response to the original request or the duplicate request.

And, even if the Court were to find that Chase violated RESPA by their failure to respond to the second QWR, such a finding alone is not sufficient for Borrowers to succeed on their RESPA claim. Borrowers have not shown that Chase committed a pattern or practice of violating RESPA as Ms. Jackson relies only on her "information and belief." Likewise, there is no evidence that

Chase's RESPA violation of failing to respond to the April 27, 2011 letter caused Borrowers' actual damages. ("Plaintiffs must come forward with evidence sufficient to support an award of actual damages to pursue their RESPA…claim[]"). *Catalan v GMAC Mortgage Corp*., 629 F.3d 676, 693 (7th Cir. 2011).

Borrowers also allege that Chase violated § 2605(e)(3) of RESPA by providing information to consumer reporting agencies regarding overdue payments allegedly owed by Borrowers that were related to their QWR. Section 2605(e)(3) provides that "[d]uring the 60-day period beginning on the date of the servicer's receipt from any borrower of a [QWR] relating to a dispute regarding borrower's payments, a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency." 12 U.S.C. § 2650(e)(3). Borrowers have not provided any evidence that Chase made any reports to a consumer reporting agency within sixty days of Chase's receipt of the January 10, 2011 QWR, relating to their December 2010 mortgage payment. Any negative account information submitted to the credit bureaus relating to the placement of the Borrowers' account in default status and the Notice of Intent to Accelerate and Foreclose was would have been sent prior to the QWR, and therefore would not have been prohibited by RESPA.

Finally, Borrowers have not cited to any legal authority that would have required Chase to cease collection efforts on their mortgage account, nor have they cited to any authority that gave them the right to cease making monthly payments on their mortgage as of January 2011. In a letter dated January 31, 2011, Chase explained that they would no longer be able to debit Borrowers monthly mortgage payment through the Autocharge Program ("ACH") because of the delinquent status of the loan. (Filing No. 60-6 at p. 3). Borrower's argument that Chase should have continued the ACH withdrawals is disingenuous. The continued collection efforts were not merely as a result

of the December 2010 payment being placed into a suspense account, but also for Borrowers' subsequent refusal to pay and ignoring calls and correspondence from Chase for several months. The damages alleged by Borrowers arose not from Chase's response to their QWR, but rather initially due to their own error with respect to the refund of their Allstate insurance premium in 2009, the underpayment of their monthly scheduled mortgage payment for 2010 and their continuing refusal to make payments on their mortgage account in 2011.

At bottom, Borrowers have not shown that any of their alleged damages were directly and proximately caused by any of Chase's actions under RESPA. No reasonable jury could conclude that Chase's correspondence—or alleged lack thereof— caused the actual damages claimed by Borrowers, including their divorce, loss of credit, failure to obtain employment, loss of business, and physical and emotional damages. Because Borrowers have failed to show that Chase violated RESPA, they have also failed to show that Chase engaged in a pattern or practice of violating RESPA, making an award of statutory damages inappropriate as well. The Court concludes that Borrowers have failed to present sufficient questions of material fact showing that they can prove their claims under RESPA, and therefore **DENIES** Plaintiffs' motion for partial summary judgment, and **GRANTS** Chase's motion for summary judgment on their claims.

## IV. CONCLUSION

For the reasons set forth above, the Court finds that Plaintiffs have not presented sufficient evidence to show that they are entitled to summary judgment on their RESPA claims, and have not presented sufficient questions of material fact to defeat Chase's motion for summary judgment on their RESPA and breach of good faith and fair dealing claims. Therefore, Plaintiffs' motion for partial summary judgment (Filing No. 59) is **DENIED**, and Chase's motion for summary judgment (Filing No. 61) is **GRANTED**. Plaintiffs' claims are hereby **DISMISSED with**

**prejudice**.

SO ORDERED:

Date: 5/8/2015

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Brian Scott Jones
BOSE MCKINNEY & EVANS, LLP
b.jones@boselaw.com

Christina M. Bruno
BOSE MCKINNEY & EVANS, LLP
cbruno@boselaw.com

David J. Jurkiewicz
BOSE MCKINNEY & EVANS, LLP
djurkiewicz@boselaw.com

Joel T. Nagle
BOSE MCKINNEY & EVANS, LLP
jnagle@boselaw.com

Steven D. Groth
BOSE MCKINNEY & EVANS, LLP
sgroth@boselaw.com

Ryan R. Frasher
RYAN FRASHER P.C.
rfrasher@frasherlaw.com